UNITED STATES of America and Equal Employment Opportunity Commission, Plaintiffs,

v.

REAL ESTATE ONE, INC., Defendant.

Civ. No. 39743.

United States District Court, E. D. Michigan, S. D.

Jan. 20, 1977.

Judgment March 2, 1977.

Robert Eccles, Walter Gorman, U.S. Dept. of Justice, Civil Rights Div., Housing Sec., Elizabeth H. Z. Halstead-Doucet, Equal Employment Opportunity Commission, Washington, D. C., for plaintiffs.

Patrick Keating, Daniel J. Henry, Jr., Schuur, Keating & Wells, P. C., Detroit, Mich., for defendant.

## JUDGMENT

At a session of said court held in the Federal Building and U. S. Courthouse, Detroit, Michigan, on March 2, 1977.

CHURCHILL, District Judge.

Pursuant to the opinion of this Court dated January 20, 1977, which opinion is made a part of this judgment;

IT IS ORDERED, ADJUDGED, AND DECREED:

(1) That the defendant, the defendant's officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of this judgment by personal service or otherwise, are enjoined from:

(A) Failing or refusing to show or negotiate for the sale of any dwelling, and from making any dwelling unavailable to any person because of race, color, religion, or national origin;

(B) Discriminating against any person in the terms, conditions, or privileges of purchase of a dwelling or in the furnishing of information, services, or facilities in connection therewith because of race, color, religion, or national origin;

(C) Attempting to influence or influencing the residential choice of any person because of race, color, religion, or national origin;

(D) Engaging or participating in any effort to prevent or avoid the sale of a dwelling to any prospective purchaser because of opposition by the prospective seller, his or her neighbors, or any other person to the sale of the dwelling to a person of the prospective purchaser's race, color, religion, or national origin;

(E) Making, printing, or publishing or causing to be made, printed, or published any notice, statement, or advertisement with respect to the sale of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, or national origin;

(F) Coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the Fair Housing Act of 1968.

(2) That the defendant shall educate all of its sales personnel with respect to the kind of conduct which is required by and prohibited by this judgment and shall advise such salespersons that failure to comply with instructions given as to the conduct required by and prohibited by this judgment may result in termination as a salesperson or other appropriate action, including sanctions under this judgment. This instruction shall be given within thirty (30) days after the entry of this judgment and thereafter within fifteen (15) days of contracting with any new salesperson, and

it shall be repeated at least bi-annually with respect to all such persons.

(3) That the defendant shall maintain records with the names, addresses, and telephone numbers (if available) of all persons involved in every instance in which a prospective black buyer visits a suburban office and of every instance in which a white person protests to the defendant because of the showing or sale of property to black persons. In any instance in which any of the required information is refused or otherwise not available, the record to be maintained by the defendant shall indicate the fact of such refusal together with such other information as may be reasonably available. The maintenance of such records shall commence within thirty (30) days of date of this judgment, and a copy thereof shall be delivered to the plaintiffs from time to time.

(4) That the defendant shall, within sixty (60) days from the date of this judgment, put into effect a program of education, encouragement, assignment and reassignment of present and new salespeople which shall include the following features:

(A)  All salespersons shall receive copies of this opinion and judgment.

(B)  The defendant shall disseminate to all such persons information about each of its offices which will enable them to make reasoned decisions concerning desired assignment and reassignment, including area descriptions, data about the sale prices of homes listed and sold, average and top commissions earned annually, and such other information as the defendant deems appropriate.

(C)  All such salespersons shall be given the real opportunity to visit several offices and to participate in tours of typical homes listed for sale by the offices.

(D)  All black salespersons shall be encouraged to attempt to work out of suburban offices on a full- or part-time basis without loss of the opportunity to be reassigned to offices in the city of Detroit if they so elect.

(5) That within ninety (90) days from the date of this order the defendant shall advise this Court in writing, with a copy to counsel for the plaintiffs, of the manner in which it intends to comply with the requirements of Paragraphs 2, 3, and 4 of this judgment.

(6) That the defendant shall, within thirty (30) days from the date of this judgment, compute and file with the Court the dollar volume of its advertising in the Michigan Chronicle during the year 1975 and the dollar volume of all of its newspaper advertising during the same year. Commencing ninety (90) days from the date of this judgment and continuing until further order of this Court, the defendant shall continue to commit at least the same percentage of its newspaper advertising budget to Michigan Chronicle advertising. The nature of Michigan Chronicle advertising shall be the same as the nature of the defendant's advertising in newspapers with local circulation. If it shall be the policy of the defendant to advertise specific properties in other newspapers, then the same policy shall be followed in Michigan Chronicle advertising. For ease in administration of advertising policies, specific homes advertised in the Michigan Chronicle may be categorized in groups. For every dollar of advertising of a group of homes in the Michigan Chronicle, a dollar shall be spent for advertising homes from the same group in other newspapers; and at least one-third (⅓) of such dollar volume in other newspapers shall be in newspapers other than the Detroit News and the Detroit Free Press and shall be in some newspapers with significant circulation in an area within a few miles of the parcel advertised. At the defendant's option, it may satisfy up to fifty percent (50%) of this one-third requirement by placing a proportionate amount of advertisements of properties located in suburban areas in the Michigan Chronicle provided that these properties are not located in the suburban communities which have already experienced a significant increase in black population as described in the opinion of the

Court. Within ninety (90) days from the date of this judgment the defendant shall file with the Court a list of such other newspapers and shall report immediately to the Court any changes in such list. At the time of the filing of the information required in this paragraph, the defendant may request and obtain an ex parte order requiring that such information be placed in a sealed envelope and that such information shall be available only to the Court and to the plaintiffs in accordance with this judgment.

(7) That all reports and information filed by the defendant under this judgment are commercial and financial information and are privileged and confidential. No information obtained pursuant to this judgment shall be divulged by any representative of the Department of Justice or the Equal Employment Opportunity Commission to any person excepting a duly authorized representative of the executive branch of the United States except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this judgment. If any such information is divulged to a duly authorized representative of the executive branch, outside the Civil Rights Division of the Department of Justice or the Equal Employment Opportunity Commission, such information shall be given only after notice to the defendant at its principal office and upon the condition that it shall not be revealed to any person outside of such representative's department or agency except where required by regulation, statute, or pursuant to court process.

(8) Annually, on the anniversary date of this judgment, the defendant shall file with the Court a report which shall detail the manner in which said defendant has complied with this judgment. A copy of such report shall be delivered to the plaintiffs. After five (5) full years of substantial compliance with the terms of this judgment, the reporting and record keeping aspects of this injunction shall terminate.

(9) The Court retains jurisdiction of this action and may make such modifications in the judgment as shall, in the light of experience, be appropriate.

(10) The Court, in the exercise of its discretion, orders that no costs shall be allowed to any party. (This provision is included in this judgment for the reasons set forth in footnote 1 and on pages 1147, 1148, and 1149 of the Court's opinion of January 20, 1977.)

IT IS SO ORDERED this 2nd day of March, 1977.

## OPINION

This case was filed on March 3, 1973, by the United States of America against the defendant Real Estate One, Inc. (hereinafter REO), alleging a pattern or practice of discrimination based on race and color in violation of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. 3601 et seq. (the Fair Housing Act), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. (the Equal Employment Opportunity Act), and a denial to a group of persons of rights protected by the Fair Housing Act. On March 3, 1975, the Equal Employment Opportunity Commission (EEOC) was substituted as plaintiff on the Title VII claim, in accordance with amendments to Title VII. The defendant has denied it has been responsible for any significant violations of the Fair Housing Act or the Equal Employment Opportunity Act.

Prior to actual commencement of the suit, there was an investigation by the United States to find evidence of housing and employment discrimination by REO. The investigation was extensive, expensive, and exhaustive.[1] This investigation began in November of 1971. Notice of intent to sue was mailed in August of 1972.

1. It appears that the defendant has cooperated with the government to enable it to complete such investigation. In retrospect it also appears that the government was less candid with the defendant in the pre-trial disclosure of its position and of the incidents of discrimination which it intended to prove.

Trial began July 15, 1975, and ended September 25, 1975. Approximately 120 witnesses testified. On April 23, 1976, tentative findings of fact were filed. Most of them are incorporated herein unchanged. The parties then filed briefs. On June 29, 1976, oral argument was held, and the matter was taken under advisement.

*The Applicable Law and the Court's Function*

There appears to be no essential dispute as to the law.

The following statement of applicable law is a direct, albeit incomplete, quote from the defendant's brief, with citations generally omitted:

"Title VIII of the Civil Rights Act of 1968 (42 USC 3601 et seq.), and Title VII of the Civil Rights Act of 1964 (42 USC 2000e et seq.), are a permissible exercise of congressional power, under the Thirteenth Amendment, to bar all racial discrimination, private as well as public, in the sale and rental of real property and in equal opportunity in employment matters. * * *

"The Fair Housing Act implements a policy to which Congress has accorded the highest national priority, and it is to be liberally construed in accordance with that purpose. 42 USC Sec. 3601 . . It bars sophisticated as well as simple-minded modes of discrimination . . . and prohibits conduct with racially discriminatory consequences, regardless of motivation. * * * Courts look to substance rather than to the form of transactions . . . and may find racial discrimination, although the ostensible purpose was nonracial. * * *

"Plaintiff must prove its case by a preponderance of evidence and if no violation of rights is shown, is not entitled to any relief . . .

"Where a violation of either the Fair Housing Act or the Equal Employment Opportunity Act is shown, the Court has broad discretion in determining the scope of relief which it may order . . .

"Fair Housing and equal employment opportunity actions are equitable in nature and general equity concepts (including but not limited to the general principle that irreparable injury is presumed when a violation of law is demonstrated) apply. * * * "
(Defendant's Conclusions of Law, pp. 1, 2, 3.)

The Court may also appropriately quote with approval from the plaintiffs' proposed conclusions of law, omitting some citations, as follows:

"3. The gravamen of the claims under the Fair Housing Act pertains to the practice known as racial steering. Racial steering has been aptly defined by Judge Keith of this Court as 'the use of any word or phrase or action by a real estate broker or salesperson' which influences the choice of a prospective buyer on a racial basis or 'which in any way impedes, delays, or discourages on a racial basis a prospective homebuyer from purchasing housing.' *Zuch v. Hussey,* 394 F.Supp. 1028, 1047 (E.D.Mich.1975) . . . See also *Zuch v. Hussey,* 366 F.Supp. at 553, 557 (E.D.Mich.1973).

"4. 'If choice influencing factors are not eliminated, freedom of choice is a fantasy.' * * * Accordingly, the courts have held racial steering to be a barrier to free residential choice and a violation of the Fair Housing Act, in that this practice makes housing unavailable because of race and fosters the perpetuation of segregated communities in violation of 42 U.S.C. 3604(a). * * * "
(Plaintiffs' Proposed Conclusions of Law, pp. 1, 2.)

Every violation of the Fair Housing Act would not justify the granting of relief in a suit by the government. Title 42, U.S.C. 3613 provides:

"Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title . . ., or that any group of persons has been denied any of the rights granted by this title . . .

and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this title . . ."

Although the statutory language of "pattern or practice" is couched in terms of the Attorney General's belief as a condition to bringing suit, the courts have almost consistently treated the statute as an expression of that which the government must prove to be entitled to relief.

The Court's most challenging tasks have been to draw reasonable inferences from established, specific facts in terms of patterns or practices and then to shape relief as necessary to insure the full enjoyment of the rights granted by the act.

*Patterns of Racial Change in the Detroit Metropolitan Area*

Since this case deals with race and the Detroit housing market, it is necessary to understand the racial patterns which have existed in recent years in the Detroit metropolitan area. Patricia Becker, head of the Data Coordination Division of the City of Detroit Planning Department, testified and was qualified as an expert in the evaluation of population data and in the racial composition of the population within the city of Detroit. Based primarily on her testimony, which was highly credible, the Court makes the following findings with respect to racial population trends and patterns in the Detroit area in the years 1940 to 1970.

Within the city of Detroit the concentrations of black residents expanded from the center of the city to the east and northwest. In 1970, west of Greenfield Road, the city was virtually all white. The remainder of northwest Detroit,[2] east of Greenfield over to Woodward Avenue, was either significantly or predominantly black. Outside the city limits the population remained virtually all white from 1940 to 1970, except for well-defined pockets of black concentration in parts of Inkster and Romulus, River Rouge and Ecorse, Mt. Clemens, Clinton Township, and Royal Oak Township. In contrast to the rapid expansion of black areas within Detroit, the black population in the suburbs remained essentially stable in the 1940–1970 period with only a minor expansion of the existing black pockets.

Although no census data are available for the years since 1970, the Court is able to make findings based on other evidence concerning racial patterns and trends from 1970 through September of 1975.

The movement of the black population into northwest Detroit has continued; and many formerly all-white areas of northwest Detroit, especially the area between Greenfield and Southfield Roads, have been areas of rapid racial change. A large majority of home sellers in the areas served by REO's northwest Detroit offices was white, while an increasing majority of purchasers was black. There is probably no area in northwest Detroit which was not somewhat integrated by September of 1975, although it remained true as a general rule that the farther west one travels within northwest Detroit from Woodward Avenue toward Telegraph Road, the less dense are the concentrations of black residents.

Significant numbers of black families have moved into suburban communities adjoining northwest Detroit, such as Southfield and Oak Park. There is a greater percentage of black families in the parts of Southfield and Oak Park nearer the Detroit boundary than farther north. There have been some black families moving into other predominantly white suburbs, but there is no evidence of any real trend. Some sub-

2. Northwest Detroit is used in these findings to include all of the city west of Woodward Avenue and north of Tireman Road, although it was apparent that some witnesses considered northwest Detroit to encompass a smaller area.

urbs have a reputation of being especially inhospitable to blacks, and few black families have moved into such communities.

The decision of where to live, made by white families and black families, is influenced by many interrelated factors, including economic factors and including existing racial attitudes by whites and blacks. Blacks and whites are also influenced in their decisions by such factors as crime rates, quality of schools, fear of school bussing, city taxes, and general neighborhood attrition. The so-called "white flight" consists as much of the decision by white families not to purchase available homes in a given area as of an affirmative decision to move because of racial factors, at least in the early stage of neighborhood change.

It is now realistically possible for any black family to purchase a home within its economic means in any suburb in the Detroit metropolitan area, assuming such family is willing to put up with varying degrees of neighborhood and community hostility or at least inhospitality. Few black families desire to be housing pioneers. It is by no means clear that any amount of sales effort by a real estate company could influence a significant number of black families to choose to live in certain Detroit suburbs.

In summary, the Court finds that, with the exception of areas adjacent to already existing black areas, the Detroit suburbs continue to be overwhelmingly and recognizably predominantly white; and this situation is likely to continue in the foreseeable future for the reasons outlined above.

### The REO Organization

The defendant Real Estate One, Inc. (REO) is a Michigan corporation formed on January 6, 1970, and engaged in business primarily as a broker for the resale of existing homes. It was formed by the purchase of assets from four still existing corporations which operated real estate brokerages in the Detroit area: Elsea Realty and Investment Company; the Gordon Williamson Company; Mathers, Stevens, and Martin; and Deremo and Son. These four corporations and William Y. Mathers own all of the stock in REO. None of the four corporations is now actively engaged in real estate sales.

The formation of the new company was announced to the salespeople for the four companies at a joint meeting on January 18, 1970, and actual operation of the REO sales organization began the next day, January 19, 1970. REO was not immediately able to inaugurate many of the changes which were ultimately made in the procedures used by the four companies. The sales offices of the four companies became the sales offices of REO. The licenses of the salespeople for the four companies were transferred, and the vast majority of these salespeople became REO salespeople without the need for any process of reapplication. The operating officers and managers of the four companies became, with minor exceptions, the operating officers and managers of REO. An REO Policy Manual was distributed to the sales associates, and the name of REO was substituted for use on signs and in advertising.

When REO began operation, it had 21 sales offices in the Detroit area and approximately 350 salespeople. It currently operates 27 sales offices in the metropolitan Detroit area, 5 of which are located in the city of Detroit, and has about 400 salespeople licensed to it. Since its formation in 1970, REO has had a total of approximately 2,500 salespeople licensed to it at one time or another. In addition to the salespeople, REO employs about 150 salaried workers. About ten percent (10%) of REO's sales come through its participation in the Inter-City Relocation Organization (RELO). The company is engaged in interstate commerce. Although no exact figure can be determined, it is probable that REO has had contact with over one-half million prospective sellers and buyers from the time of its inception until the conclusion of proofs.

*The status of a Salesman*[3]

REO maintains and exercises significant control over the activities of its salespeople by operation of law[4] and by contract. A written contract is entered into between REO and each of its salespeople. The contract defines the rights and duties of the contracting parties and provides that the relationship may be terminated by either party at any time. The REO salesperson's ability to function in the real estate business is totally dependent on REO. A person cannot take the real estate licensing exam unless he or she is sponsored by a broker. Once the salesperson has passed the exam, he or she can do business only if his or her license is held by a broker. A sales associate's license is placed in escrow if it is not assigned to a broker, and the associate receives only a pocket card while a wall copy of his or her license is sent to the broker. A sales associate cannot receive commissions on any real estate transaction, not even the sale or a transaction involving the sale of his or her own home, except through a broker. A sales associate can only work for one broker at a time; and if the broker's license is suspended, the associate cannot receive commissions. Also, a sales associate cannot advertise without putting the broker's name on the ad and cannot close a deal unless the broker actually signs the closing statement. If he or she does not meet the minimum earnings standard of REO, the salesperson's license is either placed on inactive status or returned to the Department of Licensing and Regulations. The salesperson takes nothing with him or her on leaving REO except the right to collect accrued commissions. The salesperson takes no right in listings on unsold property.

The control exercised by REO over its salespersons falls short of the normal employer/employee relationship. There is no withholding of income tax or Social Security taxes. There are no hospitalization benefits, pension benefits, etc. Although REO certainly encourages its salespeople to devote full time to the real estate business and to take a fair share of floor time at an assigned office, the individual salesperson exercises a great degree of personal independence in the manner in which he or she goes about obtaining listings and making sales.

The control, in fact, exercised by REO office managers over salespeople assigned to the office has varied from time to time and office to office. During the first few years of operation by REO, Staunton Elsea, the manager of office # 6, maintained a rather direct personal supervision over the salespeople assigned to office # 6, and particularly so with respect to black salespeople.

REO has given black persons an equal opportunity with white persons to become licensed salespersons. Many prospective salespeople became interested in association with REO because of advertisements in the Detroit News and the Detroit Free Press, each of which is widely read by blacks and whites. There is no credible evidence that anyone has been denied the opportunity to become an REO salesperson because of race. In fact, consistent with its policy of maintaining a strong competitive position in northwest Detroit, REO has made a concerted effort to recruit, train, and keep licensed black salespersons.

The parties have stipulated that REO is an employer within the meaning of 42 U.S.C. 2000e. It is unnecessary to determine if a salesperson is an employee within the meaning of 42 U.S.C. 2000e(f) because the plaintiffs' assertion that the defendant is bound by Title VII in its relationship with its salespeople is not contested by the defendant.[5]

3. All Michigan statute references to real estate salespersons are in the masculine gender. M.C.L.A. 451.201 et seq.

4. A broker is required to maintain a degree of control over a salesperson by state statute. M.C.L.A. 451.201 et seq.

5. There has been no assertion in this suit of discrimination with respect to employees in capacities other than salespersons.

*REO's Affirmative Leadership Role*

Officers of REO have taken leading roles within the real estate industry in the state and city and within their own organization to educate real estate salespersons regarding the scope of Fair Housing laws and the absolute necessity of compliance therewith.

Daniel Richard Williamson, Vice President and Secretary of REO, is co-chairman of the Michigan Association of Realtors Committee on Equal Opportunity in Housing and has served on similar committees in other associations. In 1972 the National Association of Realtors adopted a code for equal opportunity in housing and recommended that state and local associations adopt the same. The Wayne County and state boards have adopted the code. Williamson has worked with the Michigan Civil Rights Commission to prepare and adopt an affirmative action program in real estate marketing. He is author of a skit entitled "No, No, That Can't Be Done", which was prepared in cooperation with Lillian Benbow of the Michigan Civil Rights Commission. It has been performed for several real estate associations, including the State Convention of the Michigan Real Estate Association. It has also been enacted before several local boards and groups. A slide program entitled "Winds of Change", which effectively explains some of the purposes and the scope of Fair Housing laws, was prepared by the National Association of Realtors. REO purchased the program in November of 1974, and it is now shown to all salespeople who take the post-licensee course, and it has been shown to most sales office staffs.

REO has a program of education of its own sales personnel in compliance with the Fair Housing laws in the initial training programs and through courses, sales meetings, manager, and bulletins. It has real estate salespersons who have the first direct contact with prospective sellers, and of necessity many salespersons make a sincere effort to educate the public with respect to the scope of Fair Housing laws and the necessity for compliance therewith. Each homeowner listing a home for sale with REO receives a folder explaining the Fair Housing laws. On some occasions REO has lost listings because they have told owners that properties would be shown to all comers notwithstanding their race.

REO also has a program of encouraging feedback cards from buyers and sellers who have completed transactions with the company. They have never received a direct complaint of racial discrimination via this medium.

REO is probably the only real estate firm in the state of Michigan operating on a large scale in areas which are predominantly white as well as areas which are predominantly black with a biracial sales force.

*Assignments of Black Salespersons*

The race of salespersons has been a very significant factor in the determination of the office at which salespersons work, and in the determination of whether salespersons have been assigned or have transferred from one office to another, from the time of the formation of the company continuously until the conclusion of proofs at the trial.

At the time of formation of Real Estate One, Elsea Realty and Investment Company (ERIC) had black sales associates, all of whom were assigned to its West Fort Street office, which became REO office # 6. The other companies had no black salespersons.

During the first 2½ years of REO's operation, the same pattern continued. REO took on a few black salespersons, all of whom were assigned to office # 6.

During the summer of 1972, REO caused two of its offices in northwest Detroit to take on black salespersons. REO had four offices in northwest Detroit. Of these four, # 9 and # 12 were located the farthest east. By 1975 all of the salespersons in office # 9 were black, and most of the salespersons in office # 12 were black. By 1975 office # 6 had become an all-white office, and there were no significant numbers of black salespersons in any office of the company located outside Detroit.

The administration of recruitment of salespersons and the administration of the

assignment of salespersons to offices has been largely under the direction of one person—Staunton Elsea. When REO was formed, he stayed on at office # 6 as manager thereof. In 1973 he left office # 6 and went to a suburban office, from which he continued to direct the salesperson recruitment program.

From the commencement of the company through 1975, the manner in which Staunton Elsea administered the recruitment and assignment of salespersons must necessarily have been readily apparent to everyone connected with the company.

Until on or about the date of commencement of this suit, it was the policy of the company to have all or almost all black salespersons assigned only to certain specified offices. This policy was never expressed in writing and probably not in words. I infer that it was the policy of the company because it was the clear practice of Staunton Elsea, a company officer, to control the assignment of black persons to certain offices, and the rest of the officers and directors did little or nothing to change the manner in which he administered the recruitment and assignment of salespersons.

About the time of commencement of this suit, but not necessarily because of it, it became the policy of the company to allow black salespersons to be assigned to any office within the company. The previously existing patterns of assignment continued, however, for two reasons: (1) The company took very little affirmative action, if any, to change it, and (2) most black salespersons, for personal and economic reasons, real or imagined, preferred it.

One economic fact of real estate life has nothing to do with race as such, but it has caused black salespersons to want to work in areas in which large numbers of blacks live and into which large numbers of blacks are moving. In the highly competitive real estate market of metropolitan Detroit, the first contact with a prospective seller or a prospective buyer is the important thing. The best sources of prospective sellers and to a lesser extent of prospective buyers are the relatives, neighbors, and other acquaintances of the salesperson. It is a simple fact that black salespersons, like white salespersons, have the majority of their relatives, neighbors, and other acquaintances near their own homes; and most black salespersons, like most other black people in metropolitan Detroit, live in certain identifiable areas of Detroit.

Other advantages in working near home involve travel time and expense and familiarity with the neighborhood.

Could black salespersons make a good living listing and selling homes in predominantly white areas in metropolitan Detroit? There has been very little, if any, experience upon which to base a conclusion. There appears to be a general lack of confidence among officers of REO and black salespeople alike that they could do so. At times REO officers have not only discouraged blacks from attempting to sell homes in white areas, they have also actually prohibited such attempts. The record is clear that Staunton Elsea, while manager of the Elsea office, virtually ordered black salespeople not to attempt to show homes in white areas. There is, however, nothing in the record to support a finding that black salespersons were so treated in 1974 or 1975.

It is difficult to make findings about changing racial attitudes based on the evidence, however extensive, of one lawsuit against one real estate company alone. While there was evidence that white resistance to the integration of some neighborhoods in the city and in the suburbs is massive and effective, it is by no means clear that, other things being equal, black salespersons could not make a living selling real estate on a commission basis in some white residential neighborhoods. There is some reason to believe that racial bias in housing is becoming more sophisticated. White neighbors realize that salespeople come and go and that buyers stay.

I am, however, convinced from the evidence that there will be little real integration of the sales force of REO throughout the metropolitan area in the foreseeable

future if the following conditions continue to exist:

    (1) Compensation is based strictly on a percentage commission.

    (2) Black sales people are free to be assigned where they want to be assigned.

    (3) The same black salespeople have the opportunity to work out of offices in neighborhoods in which large percentages of the buyers are black.

### The Steering Effect of Assignment Policies and the Remedy Therefor

Certain observations about the workings of the residential real estate market might be self-evident, but they were confirmed by the evidence in this case, and they need to be expressed. Real estate salespeople influence the decision of many buyers in neighborhood selection. Salespersons have a tendency to sell homes in the area near the offices to which they are assigned. All-white offices attract white buyers and have a tendency to discourage black buyers. An all-black office has a tendency to attract black buyers and discourage white buyers.

There is probably nothing that would facilitate and encourage some gradual and voluntary residential racial integration more than would racially integrated sales offices. A real estate broker does not have an affirmative duty to integrate the community it serves, but it does have a statutory duty not to follow policies, patterns, or practices which have the opposite effect. In some degree the past discriminatory policy of the defendant with respect to the assignment of salespersons by race has set the pattern for and has influenced the presently racially imbalanced pattern of salespersons assigned to its several offices in and out of the city of Detroit. It is the Court's determination that the defendant's failure to take affirmative action to overcome the effects of its past racially discriminatory policy in clear violation of the then existing law constitutes a pattern or practice with a discernible steering effect.

█ Without justifying its violation of law as thus defined, I must also infer from the evidence that the presently existing pattern of racial assignment results more from the attitudes of its salespeople, black and white, and from the biases of the community than from anything else. It is for this reason that neither a suburban black quota nor special financial incentives for black salespeople in suburban offices has been adopted as an appropriate remedy.

The defendant shall be required to put into effect a program of education, encouragement, assignment and reassignment of present and new salespeople which shall include the following features:

1. All salespersons shall receive copies of this opinion and of the resulting judgment.

2. The defendant shall disseminate to all such persons information about each of its offices which will enable them to make reasoned decisions concerning desired assignment and reassignment, including area descriptions, data about the sale prices of homes listed and sold, average and top commissions earned annually, and such other information as the defendant deems appropriate.

3. All such salespersons shall be given the real opportunity to visit several offices and to participate in tours of typical homes listed by the offices for sale.

4. All black salespersons shall be encouraged to attempt to work out of suburban offices on a full-or part-time basis without loss of the opportunity to be reassigned to offices in the city of Detroit if they so elect.

### The Steering Effect of Certain Newspaper Advertising and the Remedy Therefor

REO has a large advertising budget including television, radio, billboard, and newspaper advertising. The TV, radio, and billboard advertisements are institutional. Most of the newspaper advertising is of specific listed residential properties, either in separate multiline ads or in bulk ads.

The advertising program is centrally controlled under policies adopted by top management. It has been the policy of the company to have central control over adver-

tising from the inception of the company, but it took several years for this policy to become totally effective. The home office determines which newspapers will be used and how much space will be purchased for the listings of each office. The local office manager selects the properties to be advertised. The ads are then placed by the home office.

REO has many purposes for advertising listed properties in newspapers: (1) To attract buyers already in the market; (2) to cause prospective sellers to list their properties; (3) to keep people who have been listing their homes contented; and (4) to keep salespersons with listed properties satisfied.

There may also be other economically desirable effects of newspaper advertising, such as creating demand for a specific parcel among persons not already interested in purchasing a home and attracting new salespeople.

There was much argument concerning the prime importance of the first or second listed purpose. They are both important reasons for advertising specific properties in newspapers.

For the purpose of relationship to the issues in this suit, the newspapers used by REO for advertising may be divided into three groups:

(1) The Detroit News and the Detroit Free Press, each of which has large Sunday and daily statewide distribution, including the city of Detroit and the rest of the metropolitan area.

(2) Daily and weekly newspapers with primary circulation in certain areas, often identified with a suburban community or communities.

(3) The Michigan Chronicle.

The Michigan Chronicle is a Detroit based weekly. Its news stories are those of primary interest to black people. Its primary circulation is among black people. Its circulation is presumably area-oriented be-cause, and to the same extent that, there are concentrations of blacks in parts of the city of Detroit and elsewhere in the metropolitan area. The defense attorneys argue that there is no proof of the black circulation or area distribution of the Michigan Chronicle. The manner in which REO uses the Chronicle for advertising purposes is a clear indication that their advertising managers believe the above conclusions are true.[6]

REO asserts that its primary policy is to advertise homes only in newspapers with general circulation in the area where the homes are located. Homes advertised in the News and the Free Press, of course, fit this policy. There was no clear explanation as to the policy followed in selecting properties to be advertised in the News and the Free Press. With the exception of certain ads in the Michigan Chronicle, the evidence supports this contention. Occasional exceptions in local newspapers result from mistake or experimentation.

There are good economic reasons for this policy. It accomplishes all of the purposes of newspaper advertising listed above. Ads in local newspapers even reach many persons living outside the area because, if they are interested in buying in the area, such persons may be expected to and frequently do obtain local newspapers.

The exception involves REO's advertising policy with respect to the Chronicle. REO does use the Chronicle to advertise homes located in the area where it is circulated, but there is also a clear, consistent, well-established pattern of advertising homes in the so-called "changing areas" of northwest Detroit in the Chronicle. If the Chronicle has some circulation in the "changing area", so much the better from REO's point of view; but the primary reason for its use is to reach other black prospects who may wish to buy a home in the changing area. On some occasions the same homes may be advertised in the Detroit News or the Detroit Free Press, but there is no consistent

---

**6.** Many people who read the Chronicle also read the Free Press or the News, and there are probably as many black people reading each of the two metropolitan dailies as reading the Chronicle.

policy to do so. The policy is not pursued for the purpose of causing the racial composition of an area to change. It is pursued because REO has determined that the best return on its advertising dollar can be realized in this way. Pursuit of this Chronicle policy also helps establish a good relationship for future listings with persons moving into and living in the changing area.

What are the effects of REO's advertising policy? Their general advertising policy and their Chronicle advertising policy have the effect of accomplishing their general and specific purposes set forth above. Without doubt they also have the effect of influencing people in the manner in which they arrive at their individual decisions as to where to buy homes and live. The extent to which these decisions are influenced by newspaper advertising is undetermined. If all prospective buyers in the Detroit metropolitan area had ready access to all of the newspaper ads which appear in all local newspapers and in the Chronicle, some of those who ultimately decide to purchase a home in a previously selected area might be motivated or influenced to move into a different area. Specifically, REO's policy with respect to the Michigan Chronicle influences some black buyers to purchase advertised homes in the so-called "changing areas". If the same homes are not advertised in newspapers with white readers, white prospects are not influenced by newspaper advertising to buy such homes.

Many factors contribute to the phenomenon of a neighborhood or area changing its racial composition from predominantly white to mixed and eventually to black. The Court finds that the use of the Michigan Chronicle to advertise homes in such areas, without counter-balancing advertisements of the same homes in newspapers with primary circulation among white prospective buyers, contributes in some unmeasured way to the phenomenon of change.

The Court also determines that if REO is not permitted to pursue advertising policies which enable it to compete effectively with its many competitors, then it will be unable to continue to exist as a real estate broker-age operating with a biracial sales staff in all areas of the city of Detroit as well as in the suburbs.

■ Because of the racial steering effect, REO's Chronicle advertising policy is a violation of the law. The appropriate remedy in this case is quite specific. The defendant will be required to maintain its relative dollar volume of Chronicle advertising and, at the same time, counterbalance its specific home Chronicle advertising with advertising of the same specific homes in other newspapers, including some advertising thereof in nearby newspapers other than the Detroit News and the Detroit Free Press.

The defendant shall compute and file with the Court the dollar volume of its Chronicle advertising in 1975 and the dollar volume of all of its newspaper advertising in the same year. Until the further order of the Court, the defendant shall continue to commit at least the same percentage of its newspaper advertising budget to Chronicle advertising. The nature of Chronicle advertising shall be the same as the nature of its advertising in newspapers with local circulation. If it shall be the policy of the defendant to advertise specific properties in other papers, then the same policy shall be followed in Chronicle advertising. For ease in administration of advertising policies, specific homes advertised in the Chronicle may be categorized in groups. For every dollar of advertising of a group of specific homes in the Chronicle, a dollar shall be spent for advertising homes from the same group in other papers; and at least one-third (⅓) of such dollar volume in other newspapers shall be in newspapers other than the Detroit News and the Detroit Free Press and shall be in some newspapers with significant circulation in an area within a few miles of the parcel advertised.

*Racially Oriented Practices in Office # 6*

During 1971 and 1972, while all or most of the black salespersons in the REO organization were in office # 6 under Staunton Elsea's direct domination, several racial practices, all of which were carryovers from the ERIC days, were continued.

These practices were continued to make sure that black salespersons did not work predominantly in white areas and to make sure that black prospective buyers were not shown homes in predominantly white areas if doing so would be objectionable to the owners.

Staunton Elsea instructed black salespeople on ways to avoid racial conflict, and he would criticize them for doing any work in predominantly white areas. On occasions he would forcibly remove selected listings from black salespeople's listing books.

At one time it had been the overt practice of ERIC to code listing agreements and prospect card with the symbol "XX".[7] If the "XX" appeared on a listing, this indicated that it was all right to show the property to a black family. If the "XX" appeared on a prospect card, this meant that the prospect was black. Eventually, the symbol "=" had the same meanings.

The overt use of such racial symbols had been discontinued as approved office practice before the formation of REO, but they were still used on a few documents for several months after the formation of REO. It is not certain that Staunton Elsea was aware of such occasional use, but it is probable that he was because he kept a close watch on everything going on in his office.

One other overtly racial practice of the Fort Street office of ERIC was continued after the formation of REO. When a home which could be shown to a black prospect was advertised, a special phone number was used on the advertisement. The telephone set-up in the office enabled the person answering the phone to ascertain if the call was coming on on the "black" line. This enabled the company to channel prospects to black or white salespeople and ultimately to properties located in certain areas depending upon the race of the prospect.

These practices have all been discontinued at office # 6, and there is no showing that they were ever adopted in any other office, nor is there any likelihood of their reoccurrence. It is now the general policy of REO that any salesperson may seek and take a listing anywhere in the Detroit metropolitan area and that any salesperson may show and sell homes listed in any office or on a multilisting.

*Non-Compliance with Lawful Policies*

Excluding the racially oriented practices at office # 6 in 1970, 1971, and 1972, and the policies concerning the assignment of salespeople described above, and not including the advertising policies of the company, it has been the clear, overt policy of REO not to differentiate in the treatment of salespeople, prospective sellers, and prospective buyers by reason of race. Much of the testimony at the trial concerned incidents in which it is alleged that such overt policy has not been followed, either by REO or by its licensed salespeople. It is necessary to make specific findings with respect to such alleged incidents.

Neither the plaintiffs nor the defendant left any stone unturned, and there was sharply conflicting testimony with respect to almost every incident. Many of the witnesses had a clear bias to one side or the other. Some salespeople testified that they were not familiar with the racial composition of the areas in which they worked. At times such testimony may have resulted from ambiguity of the questions asked them. On other occasions the apparent lack of such knowledge was completely incredible; but it does not necessarily mean that their testimony was not credible in other respects.

On many disputed factual issues the evidence was nearly in balance. If I am satisfied from all the evidence that the greater probability of occurrence is consistent with the plaintiffs' position on an issue of fact, then I have found it to be a fact. I have not made specific findings with respect to several incidents because of remoteness in time, the vagueness of allegations with respect to persons involved, apparent insig-

---

7. This practice was probably widespread in the real estate business in the city of Detroit, and in the previous decade it had some sanction in local law.

nificance,[8] or simply because the plaintiffs have failed to prove their version of the incident by a preponderance of the evidence.

### (The Benjamin White Incident)

The Benjamin White incident demonstrates how far top management of REO did go in June of 1971 to avoid offending a predominantly white neighborhood. Dr. William Rekshan owned a vacant residential lot in Belleville which had been listed for sale with REO for seven months. Benjamin White, a black school teacher, wanted to buy it and was clearly willing and able to do so at the full listed price although he followed the usual, or at least not uncommon, practice of making an initial offer of somewhat less than the full listed price. Neighbors saw a black man looking at the property and panicked. Rekshan, who lived near his vacant lot, learned of his neighbors' concern and reacted to it by inviting neighbors to a meeting at his home. The evening meeting at the Rekshan home was attended by Rekshan, many neighbors, the REO salesman Martin, and by Carlos W. Deremo, a vice president of REO.

For a time Deremo attempted to persuade Rekshan that he was obligated to sell the property to White. Eventually, Rekshan agreed to sell the property to a neighbor whose name was Hink, under the pretext that he had a previous commitment to sell it to Hink. Deremo testified that he was eventually convinced that Rekshan was truly obligated to sell the property to Hink and that Rekshan's decision to do so was not racially motivated. Rekshan made the same assertion and even denied that racial factors were discussed at the meeting.

I find these assertions by Deremo and Rekshan to be totally incredible. In fact, Deremo simply washed his hands of the transaction and went home, with the knowledge that it would be handled by Martin.

Martin came back to his office and obtained the necessary papers to complete the sale to Hink that night.[9] Some time after midnight Martin returned to the Rekshan home, the sales agreement from Rekshan to Hink was signed, and REO had earned its commission. White's deposit was returned to him by mail. The neighborhood remained white. White complained to the Michigan Civil Rights Commission. REO's report to the Civil Rights Commission did not refer to the evening meeting.

### (The Mathers Incident)

In April of 1972 the home of REO's General Sales Manager, William Y. Mathers, located in the Rosedale Park area of northwest Detroit, was put up for sale. Although no formal listing agreement was signed, the house was handled by Mary Carr, a white sales associate in office # 11. The property was not listed on the UNRA [10] multilist. A listing worksheet was prepared which included the slogan, "Don't tell, but show and sell." The worksheet was distributed to REO's northwest Detroit offices and few REO suburban offices, all of which had all-white or almost all-white sales staffs. The one REO office which had black sales associates in April of 1972, being office # 6, did not receive a copy of the worksheet, and no "for sale" sign was placed in front of the house.

There was a sharp conflict in the testimony as to the reasons for special handling of the Mathers property. There was some direct evidence that it was being handled separately so that the property would not be shown or sold to a black family. There was other evidence that it was handled separately to avoid the embarrassment of having the REO general sales manager's house sold by another real estate firm. I am satisfied that it was left off the multilist for this latter, legitimate purpose. I

---

8. For example, a nasty racial remark from one white salesperson to another about a black salesperson is in bad taste, but it is hardly evidence of violation of federal law if no transaction, salesperson, seller, or buyer was influenced thereby.

9. The timing of completion of the sale to Hink is less clear than the racial motivation for it.

10. United Northwest Realty Association.

also find that there was intentional, concerted effort by Carr and others to avoid the risk of having the house shown to or sold to a black family. It is be no means clear that Mathers directed or even had actual knowledge of such avoidance.

### (The Fred Horton Incident)

Fred Horton was a white salesman at offices # 9 and # 10 in 1974. On one occasion Bill Smith, his trainer, told Horton not to show a black prospect a home near Warren between Evergreen and Southfield because it was a Polish neighborhood. Horton's credibility in some respects was questionable because he had a deep grudge against REO, but I do find that this incident occurred.

### (The Joseph Savine Incident)

Joseph Savine was a white salesman at the Warren office of REO in part of 1970 and 1971. He testified about one occasion in which a white salesperson retreated through the rear office door to avoid showing a black prospect a home in predominately white Warren. The incident, albeit a different version thereof, was brought to the office manager's attention.

I am satisfied that this occurred and make this finding, although in most instances I have made no finding when the potential adverse witnesses were not satisfactorily identified.

### (The Danton/Upstil Incident)

In 1972 Kaatje Upstil, an experienced, white, real estate saleswoman, told Steven L. Danton, a white salesman assigned to the Lathrup Village office, that he should not sell a certain home in Lathrup Village to a black prospect, impliedly for racial reasons.

### (The Lidgey/Appel Incident)

In 1971 an REO salesman named Gerald Lidgey tried to discourage a white prospect named Richard Appel from buying a home east of Southfield in the city of Detroit, a racially changing area. I am satisfied that Lidgey's remarks were prompted by racial questions asked by Appel. Eventually, Appel bought a home in that area through Lidgey.

### (The Ann Wettlaufer Incident)

In 1974 Ann Wettlaufer, a white resident of Oakland County acting as a tester, was informed by an REO salesman, Robert Webb, at the Lathrup Village office, that she wouldn't want to live in the city of Detroit because it was almost all black, and he further discouraged her from becoming interested in homes in the southern part of Southfield because of racial changes occurring in that area. When, during the pendency of this suit, REO learned of the incident, it terminated its relationship with Webb.

The Court heard testimony from several other testers. The techniques employed by the testers were so inept and the records kept by them were so incomplete that they do not support specific findings.

### (The Smith/Jones Incident)

In 1971 Paul Smith, a white salesman, virtually refused to show Marjorie Jones, a white prospect, a home between Greenfield and Southfield because it was a racially changing neighborhood.

### (The Henrietta Howell Incident)

One other transaction produced extensive testimony. Henrietta Howell, a black saleswoman, gave testimony in support of the government's assertion that she was discriminated against in connection with a listing because she was black. The listing was of property owned by Firman Hass, a white owner. His first contacts were were her, but a white saleswoman in the office received the listing. Race may have affected the owner's decision to list his property with a white salesperson. I am satisfied that race had nothing to do with REO's decision that the listing properly belonged to the white saleswoman. I do find that Howell received a part of a commission, that she had not earned, because she was black.

*Direct Steering Practices and the Remedy Therefor*

The racially oriented practices in office 6 were economically motivated. Listing were and are the lifeblood of the residential real estate business. To obtain and keep listings, a broker must avoid offending customers and groups of prospective customers. One certain way to risk offending large numbers of homeowners in white neighborhoods was and is to introduce black buyers or even prospective black buyers to the neighborhood. Staunton Elsea stood guard to make sure this did not happen, and the policies he enforced were in clear violation of the law. To enjoin these specific practices, however, would be meaningless. There isn't even a remote likelihood that such overt practices will be re-introduced.

■ The specific findings with respect to such practices are significant for another reason. Only by understanding the defendant's history of overt discrimination followed closely by its overt lawful policies can the Benjamin White, Mathers, Horton, Savine, and Upstil incidents be brought into perspective. A common thread runs through them all. When confronted with an actual or potential showdown between the rights of the individual black buyer or a prospective group of black buyers and the concerns of a hostile or prospectively hostile white neighborhood, there is a strong tendency to favor the white concern in contravention of rights granted to blacks by the Fair Housing Act.

In light of the defendant's history of open discrimination early in this decade and of its complete surrender to racial prejudice in the Benjamin White incident, and in order incidents described, it is the conclusion of this Court that an unlawful practice has been proven, and that similar incidents are likely to occur unless the defendant is appropriately enjoined.

Injunctive relief should be as specific as the circumstances permit. In the type of situation with which we are concerned, the means of possible violation are almost as variable as the situations themselves, and the injunctive relief must therefore be in general terms. It is necessary to restrain the defendant from any kind of conduct which is patterned in whole or in part to diminish the full enjoyment by black buyers and prospective black buyers of rights created by the Fair Housing law.[11] The court order should also require the defendant to educate all of its sales personnel with respect to the kind of conduct which is required by and prohibited by the judgment to be entered. The judgment must also provide for the defendant to maintain records with the names, addresses, and phone numbers (if available) of all persons involved in every instance in which a prospective black buyer visits a suburban office and of every instance in which a white person protests to REO concerning the showing or sale of property to black persons.

*Employment Discrimination*

The injunctive relief to assure compliance with the Fair Housing Act will have the effect of eliminating vestiges of employment discrimination. There is insufficient evidence in the record upon which to base an award of damages to individuals or even to justify the taking of further proofs with respect thereto by the Court or a master.

*Other Judgment Terms*

The judgment shall provide for annual reporting by the defendant to the Court in detail of the manner in which it has complied with the judgment. The judgment may contain provisions protecting the defendant from disclosure of the reported information to its competitors. The judgment shall contain a reasonable timetable for compliance commencing soon after entry of the judgment or determination of an appeal. The reporting aspects of the injunction may terminate after five (5) full years of substantial compliance with the terms hereof. The Court will reserve the authority to make such modifications in the judgment as shall, in the light of experience, be appropriate.

11. This sentence was corrected by order made March 2, 1977.

*Further Proceedings*

Each party is given the opportunity to submit to the Court on or before February 28, 1977, a proposed form of judgment, in duplicate, consistent with this opinion. Upon receipt of the proposed judgments from both parties, copies of each proposed judgment will be distributed by the Court to the other party. Submission of a proposed judgment will not be construed as consent to anything therein contained. Factual recitals, if any, shall be brief. Further arguments are not invited. The submitted forms will be used by the Court as aids only in working of the Court's own form of judgment.