Orlando CABRERA, Linda McCoggle and Jeanette Ramsey, on behalf of themselves and all others similarly situated, and the Open Housing Center, Inc., Plaintiffs,

v.

Emanual FISCHLER, d/b/a AM Realty Co., James Siegel, Carl Matos, a/k/a Carlos Matos, Jeno Jakabovitz, and Benjamin Breitman, Defendants.

No. CV 87–2675 (ADS).

United States District Court, E.D. New York.

Feb. 17, 1993.

Schulte Roth & Zabel, New York City, David Brodsky, Lynn E. Judell, of counsel, for plaintiffs.

Snow Becker Krauss, P.C., New York City, Leonard W. Wagman, of counsel, for defendant Breitman.

Marvin H. Wolf, Dix Hills, NY, for defendant Jakabovitz.

Emanual Fischler, pro se.

Carlos Matos, pro se.

James Siegel, pro se.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

In this class action, a jury determined that the defendants, who are landlords and real estate brokers, discriminated against two of the three individual black and hispanic plaintiffs and two other black individuals who had inquired about renting apartments in Brooklyn. The jury awarded the successful individual plaintiffs nominal damages and the plaintiff Open Housing Center compensatory and punitive damages against each defendant except the defendant-landlord Benjamin Breitman, against whom the jury declined to award even nominal damages.

Before the Court at this time are the following motions: (1) the plaintiff Open Housing Center, Inc. moves for an award of nominal damages against Breitman; (2) all successful plaintiffs seek equitable relief and an award of attorney's fees against all of the defendants, (3) the defendant-landlord Benjamin Breitman moves for "judgment on the verdict", and (4) the defendant-landlord Jeno Jakabovitz moves to set aside the verdict against him in favor of the plaintiff Jeanette Ramsey.

## BACKGROUND

Defendants Jeno Jakabovitz ("Jakabovitz") and Benjamin Breitman ("Breitman") each own apartment buildings in Brooklyn—Jakabovitz owns fourteen buildings, Breitman owns two. In attempting to rent the few vacancies which arose in their buildings during the times relevant to this action, Jakabovitz and Breitman employed the services of AM Realty Co. ("AM Realty"), a real estate agency owned and operated by the defendant Emanual Fischler ("Fischler"). Defendants James Siegel ("Siegel") and Carl (Carlos) Matos ("Matos") were two of AM Realty's salespersons during this period.

The plaintiffs alleged that Jakabovitz and Breitman, through the acts of the their agent, AM Realty, discriminated against Orlando Cabrera ("Cabrera"), a hispanic male, and Linda McCoggle ("McCoggle"), a black female, both named individual plaintiffs, and Ronald Luckett ("Luckett"), a black male, and Augustin Hinkson ("Hinkson"), a black male, on the basis of race, by refusing to show apartments in their respective buildings to these individuals.

At the trial, the plaintiffs offered proof that Cabrera, McCoggle, Luckett and Hinkson, individually and on separate occasions, went to AM Realty seeking apartments in the Brooklyn communities of Midwood, Sheepshead Bay and Kings Highway. Cabrera, McCoggle and Luckett each met with Matos; Hinkson met with Siegel. They were each told by the salesperson with whom they spoke that, in effect, no apartments matching their request were immediately available. Instead, these individuals were "steered" to available apartments in areas of Brooklyn with a greater minority population and were, in most cases, offered the opportunity to inspect these apartments.

The plaintiffs further offered proof that shortly after the black or hispanic apartment seeker left AM Realty, a white apartment seeker entered the agency and inquired about housing similar to that requested by the black or hispanic apartment seeker who preceded him or her. The proof revealed that these white apartment seekers were each told that apartments of the type and location sought by both the white and minority apartment seekers were available. Specifically, the white apartment seekers who followed Cabrera, McCoggle and Hinkson were informed of apartments available in buildings owned by Jakabovitz, while the white apartment seeker who followed Luckett was informed of the availability of an apartment in one of Breitman's buildings.

Additionally, plaintiff Jeanette Ramsey ("Ramsey"), a black female, alleged that Jakabovitz personally discriminated against her, similarly on the basis of her race. Ramsey and a white apartment seeker did not meet with anyone from AM Realty but rather dealt with Jakabovitz personally.

In sum, the plaintiffs contended at the trial that the defendants' disparate treatment of the black or hispanic apartment seekers, as compared to the treatment accorded the white apartment seekers, constituted discrimination in violation of applicable law.

The above-described activities were the product of "tests" conducted by the plaintiff Open Housing Center. Judge Haight of the Southern District of New York recently described the Open Housing Center as

"a not-for-profit New York corporation whose primary purpose is to promote equal opportunity in housing in the New York metropolitan area. It seeks to eliminate unlawful racially discriminatory housing practices in respect of the rental or purchase of apartment units in the metropolitan area, and to assure all persons seeking to rent or buy apartment units the housing of their choice, free of discrimination. In aid of these goals, the OHC assists individuals in obtaining equal access to housing; prepares and distributes information on housing in all five boroughs of New York City; investigates allegations of discrimination and refers complaints to appropriate public agencies or private attorneys; provides counseling and referral services to members of the public who seek housing opportunities; and educates members of the public about housing issues and their legal rights." (*Open Housing Ctr., Inc. v. Samson Management Corp.*, No. 91–5111, 1992 WL 309862, 1992 U.S. Dist.

LEXIS 15729 [S.D.N.Y. October 14, 1992]. *See also* Amended Complaint, ¶ 8.)

In conducting its "tests" in this case, the Open Housing Center sent a black or hispanic person to either AM Realty or Jakabovitz to inquire about available apartments in the Midwood, Sheepshead Bay and Kings Highway communities. After the black or hispanic person's visit, a white person visited the same party and asked about the availability of similar housing.

These pairs of people are commonly called "testers". They have no actual intention of renting an apartment, but pose as renters for the purpose of collecting evidence of unlawful discriminatory practices. Other than race, the tester pairs sent by the Open Housing Center purported to possess substantially similar distinguishing characteristics and personal backgrounds. The plaintiffs argued that the differences in the way the white testers and the black and hispanic testers were treated indicated discrimination.

This two-week trial resulted in a jury verdict on May 13, 1992. The jury found that salesperson Matos discriminated against Cabrera and Luckett in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.,* but determined that Matos did not discriminate against plaintiff McCoggle. Additionally, the jury found that salesperson Siegel discriminated against Hinkson, in violation of the Fair Housing Act, and that Jakabovitz discriminated against Ramsey in violation of the Fair Housing Act, the Civil Rights Act of 1870, 42 U.S.C. § 1981, involving the right to enter into a contract, and the Civil Rights Act of 1866, 42 U.S.C. § 1982, involving the right to lease real property.

Preliminarily, the jury determined that both Siegel and Matos acted within the scope of their authority and in furtherance of the business of Fischler, doing business as AM Realty. The jury further found that Fischler, doing business as AM Realty, acted as the agent of the landlord-defendants Jakabovitz and Breitman with regard to the events at issue in this case. By these findings, the jury held the landlord-defendants liable for the discriminatory acts of their agent, AM Realty.

Having so determined, the jury declined to award compensatory damages to either Cabrera or Ramsey, the testers. Instead, the jury awarded them each nominal damages in the sum of one dollar. The jury awarded the Open Housing Center compensatory damages against Siegel in the sum of $1,000, against Matos in the sum of $3,000, and against Jakabovitz in the sum of $8,000. In addition, the jury declined to award punitive damages in favor of Cabrera or Ramsey against any of the defendants, but awarded such damages to the Open Housing Center in the sums of $1,000 against Fischler, $350 against Siegel, $1,000 against Matos, and $1,000 against Jakabovitz. The jury declined to award any compensatory, nominal or punitive damages against Breitman.

When the jury determined that AM Realty acted as Breitman's agent and that Matos discriminated against Luckett, yet declined to award even nominal damages against Breitman, the Court directed the jury to further deliberate on the issue of damages against Breitman. The jury quickly returned and confirmed its original decision, declining to award any damages against Breitman.

Numerous other parties were originally named as party defendants. However, the plaintiffs and these other defendants entered into consent decrees, approved by Judge Korman of this Court, leaving only Fischler d/b/a AM Realty, Matos, Siegel, Breitman, Jakabovitz, and Marianne Hascup ("Hascup"), another of AM Realty's brokers, as the remaining defendants. At the trial, this action was dismissed as against Hascup. Additionally, Ronald Luckett was originally named as a plaintiff in this action but withdrew before the trial.

Although real estate agencies have been held liable for the discriminatory acts of the brokers they employ (*see, e.g., City of Chicago v. Matchmaker Real Estate Sales Center, Inc.,* 982 F.2d 1086 [7th Cir.1992] ), and landlords have been held liable for the discriminatory acts of their managing agents, who are employees of the landlords, (*see, e.g., Walker v. Crigler,* 976 F.2d 900 [4th Cir. 1992] ), this case may be the first in which a jury has held a landlord liable for the dis-

criminatory acts of independent real estate agents acting on behalf of the landlord. Mindful of the significance and apparent novelty of this case, the Court now turns to the parties' respective motions.

## THE INSTANT MOTIONS

*Plaintiffs' Motions*

The plaintiff Open Housing Center moves for an award of nominal damages against Breitman. All of the successful plaintiffs seek equitable relief and an award of attorney's fees against all defendants.

In their motion for equitable relief, the plaintiffs seek declaratory, prohibitive and affirmative relief. Specifically, with regard to all of the defendants, the plaintiffs request (1) a declaration that the defendants' acts violated the Civil Rights Acts of 1870, 42 U.S.C. § 1981, and of 1866, 42 U.S.C. § 1982, and the Fair Housing Act, and (2) an injunction permanently enjoining the defendants from violating the above-cited statutes.

With regard to the broker-defendants Fischler, Siegel and Matos, the plaintiffs seek an Order requiring them to (1) offer the plaintiffs and their class available apartments that meet their needs; (2) solicit and encourage blacks and hispanics to rent apartments in all Brooklyn neighborhoods, particularly in Midwood, Kings Highway and Sheepshead Bay; (3) advertise in publications such as the Spanish-language *El Diario*, and the *City Sun* and *The New York Amsterdam News* concerning apartments available in all buildings in which any defendant has an interest; and (4) submit written reports to the Open Housing Center so that the Open Housing Center can monitor the broker defendants' compliance with this Court's Order. Additionally, the plaintiffs seek a declaration that defendants Fischler and Matos continued to practice discrimination in violation of a consent decree approved by Judge Korman of this court on August 27, 1984.

As to the landlord-defendants Jakabovitz and Breitman, the plaintiffs request an order directing said defendants to (1) offer plaintiffs and their class available apartments that meet their needs; (2) submit to the Open Housing Center each month a list of all apartments available for rental in all buildings owned by these defendants, with Jakabovitz reserving one-third of the vacancies in his buildings and Breitman reserving one-half of the vacancies in his buildings for financially qualified black or hispanic apartment seekers referred by the Open Housing Center; (3) submit to the Court their rental criteria, which must be the same as with those used with respect to white tenants; (4) explain, in writing, the basis for rejecting a tenant referred by the Open Housing Center; (5) provide written instructions to all brokers or salespersons employed by these landlord-defendants stating that brokers are to refer all financially qualified applicants to them, regardless of race, color, religion or national origin, and to provide proof of the broker's receipt of such written instructions to the Open Housing Center; (6) post "fair housing" signs in the lobbies of all of their apartment buildings; and (7) advertise available apartments in *El Diario* and either the *City Sun* or *The New York Amsterdam News* whenever the landlord places an advertisement in a newspaper of his choice. The plaintiffs request that the terms of this Order remain in effect for five years from the date of entry.

The Open Housing Center further contends that it will have to hire another person in order to carry out and monitor the enforcement of the equitable relief it seeks. Consequently, it requests that the Court order the defendant-landlords to pay to the Center "monitoring costs" in the total sum of $178,250.00, or $35,650.00 per annum, for the five-year period covered by the injunction the plaintiffs seek.

With respect to their motion for attorney's fees, the plaintiffs seek an award in the sum of $975,638.49, including costs and disbursements.

Both Jakabovitz and Breitman oppose the above motions. Jakabovitz contends that the Open Housing Center's work as an "investigator" precludes an award of attorney's fees and equitable relief in the plaintiffs' favor, due to alleged violations of Article 7 of New York State's General Business Law. Similarly, Jakabovitz maintains that since the Open Housing Center's certificate of incorpo-

ration does not authorize it to conduct investigations or bring lawsuits, the Open Housing Center cannot be awarded the relief it seeks. Further, with regard to the fee application, Jakabovitz (1) takes issue with the rates at which plaintiffs' counsel seeks to recover, (2) contends that the attorney's fees and costs the plaintiffs accrued prior to reaching settlements with former defendants in this action are only partially attributable to Jakabovitz, (3) argues that the paralegal fees plaintiffs seek to recover are unreasonable, and (4) maintains that an award of attorney's fees should be in proportion to the damage awards.

In opposition to the motion for attorney's fees, Breitman argues that the computer records submitted by the plaintiffs do not allow for proper scrutiny and are thus insufficient. With respect to the motion for equitable relief, Breitman contends that because the evidence did not support the jury's verdict as it pertains to Breitman, an award of equitable relief is not proper.

None of the broker-defendants have filed any opposition to the plaintiffs' motions.

*Defendant Jakabovitz's Motion*

Jakabovitz moves, apparently pursuant to Rule 50 of the Federal Rules of Civil Procedure, to set aside the jury's verdict with respect to the plaintiff Ramsey, on the ground that the plaintiffs allegedly failed to meet their burden of proof after Jakabovitz offered proof of a nondiscriminatory defense.

The plaintiffs oppose this motion on two grounds. First, the plaintiffs argue that the Court should not consider the merits of this motion because Jakabovitz failed to make a Rule 50 motion for "judgment as a matter of law" against Ramsey at the close of the evidence. Second, the plaintiffs contend that they sufficiently demonstrated that the alleged "nondiscriminatory reasons" were actually a coverup for a racially discriminatory reason.

*Defendant Breitman's Motion*

Breitman moves for "judgment on the verdict". He contends that because the jury declined to award nominal damages against him and, in fact, confirmed its decision upon further deliberation, the clear intent of the jury's verdict was that judgment be entered in favor of Breitman. In support of this conclusion, Breitman submits two possible reasons for the jury's determination. Specifically, Breitman argues that the jury may have found (1) that Matos did not act within the scope of his agency, or (2) that Matos's discriminatory conduct with respect to Luckett did not relate to Breitman's building.

Breitman also maintains that he is entitled to judgment because he offered a nondiscriminatory defense which the plaintiffs failed to overcome, and because the verdict sheet is ambiguous.

As with Jakabovitz's motion to set aside the verdict as to Ramsey, it is unclear under what procedural rule Breitman moves. Apparently, he also moves pursuant to Rule 50 of the Federal Rules of Civil Procedure.

In opposition to Breitman's motion, the plaintiffs initially contend that Breitman has not met the heavy burden one must satisfy to succeed on a Rule 50 motion. Moreover, the plaintiffs argue that, under the circumstances presented, the Court must enter an award of nominal damages against Breitman. The plaintiffs further contend that a determination of the merit of Breitman's "nondiscriminatory reasons" was properly within the purview of the jury, which rejected these "nondiscriminatory reasons" in reaching its verdict. Finally, the plaintiffs maintain that the verdict sheet is not ambiguous and note that, even assuming that the verdict sheet is ambiguous, Breitman never objected to its form although he had ample opportunity to review it.

## DISCUSSION

*I. The Fair Housing Act*

In enacting Title VIII of the Civil Rights Act of 1968, commonly known as the "Fair Housing Act" ("the Act") and codified at 42 U.S.C. § 3601 *et seq.*, Congress exercised its power under the Thirteenth Amendment to bar all racial discrimination in the rental or sale of real property. (*See United States v. Youritan Constr. Co.,* 370 F.Supp. 643, 648 [N.D.Cal.1973], *aff'd in part, remanded on other grounds,* 509 F.2d 563 [9th

Cir.1975].) The purpose of the Act "is to protect against conduct which, either intentionally or in effect, impedes integration and/or perpetuates segregation and discrimination in housing." (*Ragin v. Harry Macklowe Real Estate Co., Inc.,* 801 F.Supp. 1213, 1230 [S.D.N.Y.1992]. *See also* Armstrong, "Desegregation Through Private Litigation: Using Equitable Remedies to Achieve the Purposes of the Fair Housing Act", 64 *Temple L.Rev.* 909, 910 [1991].)

In September 1988, during the pendency of the instant litigation, the Fair Housing Act was amended, with these amendments taking effect March 12, 1989. Whether the pre-amendment Act or the post-amendment Act is applied does not affect the Court's decision here, except with regard to the issue of attorney's fees, which is discussed below.

Prior to amendment, 42 U.S.C. § 3604 states that it is unlawful

"(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

"(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

\* \* \* \* \* \*

"(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."

The amendments to this section added "familial status" to the list of protected classifications.

Under the pre-amendment Act, 42 U.S.C. § 3612 provides for the enforcement of the provisions of the Act by private persons, while under the post-amendment Act, private enforcement is covered by § 3613. Both sections contain similar language.

The Supreme Court has held that a tester, who "may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home," is such a "private person", with standing "by virtue of her allegation that her statutorily created right to truthful housing information was violated." (*Ragin v. Harry Macklowe Real Estate Co., supra,* 801 F.Supp. at p. 1229 [quoting from *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 374, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982) ].) Similarly, an entity such as the Open Housing Center has standing upon a showing

"that it sustained actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision. *See Havens,* 455 U.S. at 378–79 [102 S.Ct. at 1124]; *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472 [102 S.Ct. 752, 758, 70 L.Ed.2d 700] (1982). Injury in fact can be established by proof that the defendant's 'purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action' [citations omitted] such as ... 'devoting more time, effort and money to endeavors designed to educate' ". (*Ragin v. Harry Macklowe Real Estate Co., supra.*)

## II. Nominal Damages in the Breitman Case and Breitman's Motion for "Judgment on the Verdict"

The Open Housing Center contends that, based upon the jury's verdict as recorded on the special verdict sheet, the entry of an award of nominal damages against the landlord-defendant Breitman is required. The Supreme Court has held that a plaintiff who suffers a deprivation of an absolute right, but is unable to prove actual damages, is "entitled to recover nominal damages not to exceed one dollar." (*Carey v. Piphus,* 435 U.S. 247, 267, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 [1978].) The Second Circuit has interpreted this holding "as *requiring* an award of nominal damages where the plaintiff proves a deprivation of an absolute right" (*Fassett v. Haeckel,* 936 F.2d 118, 121 [2d Cir.1991] [emphasis in original] ), and has directed district courts to award nominal damages in instanc-

es "when substantive constitutional rights had been violated but no compensatory damages had been proved." (*Ruggiero v. Krzeminski*, 928 F.2d 558, 563 [2d Cir.1991] [citation omitted].)

An examination of the special verdict sheet clearly indicates that the jury found Luckett's substantive constitutional rights to have been violated by Breitman's agent. The verdict sheet reads, in pertinent part, as follows:

"3. Did the plaintiffs establish that the defendant EMANUEL [sic] FISCHLER, doing business as AM REALTY CO. acted as an "agent" for the defendant BENJAMIN BREITMAN, as the Court has explained that concept to you, with regard to the incident of March 6, 1987 involving testers RONALD LUCKETT and SUSAN HAMOVICH?

YES  XX      NO ___

\*       \*       \*       \*       \*       \*

"5. Do you find that the plaintiff OPEN HOUSING CENTER, INC. established, that on March 6, 1987, RONALD LUCKETT was discriminated against by the defendant CARLOS MATOS because of his race, in violation of Title VIII, the Fair Housing Act?

YES  XX  NO ___ "

Based upon the juror's answers to the clear and unambiguous questions in the special verdict sheet, the evidence presented at the trial, and the Court's extensive jury instructions, it is beyond dispute that the jury found that (1) Matos discriminated against Luckett, in violation of Luckett's constitutional rights, with regard to the renting of a Breitman apartment; and (2) that Matos, as one of AM Realty's salespersons, acted as Breitman's agent. Accordingly, the jury's verdict holds Breitman liable for the discriminatory acts by Matos.

Nevertheless, the jury declined to award either compensatory damages or nominal damages against Breitman, despite being directed to return to the jury room to reconsider its seemingly inconsistent verdict. In light of the jury's verdict and the law set forth above, Luckett would have been entitled to an award of nominal damages had he been a plaintiff in this action.

A review of the recent cases involving the Fair Housing Act indicates that Congress has granted to organizations like the Open Housing Center standing to assert the rights of third parties, such as Luckett, under the circumstances presented in this case. (*See Huertas v. East River Housing Corp.*, 81 F.R.D. 641 [S.D.N.Y.1979]; *see also Seniors Civil Liberties Ass'n v. Kemp*, 965 F.2d 1030, 1033 [11th Cir.1992]; *LeBlanc–Sternberg v. Fletcher*, 781 F.Supp. 261, 270 [S.D.N.Y.1991] ["under the [Fair Housing Act], the distinction between 'third party' and 'first party' standing is of little significance"]; *Saunders v. General Servs. Corp.*, 659 F.Supp. 1042, 1052–53 [E.D.Va.1987] [criteria for representative standing].) Consequently, the Court should have instructed the jury to award nominal damages not to exceed one dollar in favor of the Open Housing Center and against Breitman. The Second Circuit has held that a district court's failure to make such an instruction constitutes error. (*Fassett v. Haeckel, supra*, 936 F.2d at p. 121.) Accordingly, the Court now corrects this error, grants the Open Housing Center's motion, and directs an award of nominal damages in the sum of $1.00 against Breitman. (*Fassett v. Haeckel, supra; Ruggiero v. Krzeminski, supra*, 928 F.2d at p. 564.)

The Court considered Breitman's arguments in support of his motion to set aside the jury's verdict and in opposition to the Open Housing Center's motion for nominal damages and finds them to be without merit. Initially, the Court notes that Breitman does not cite any rule as authority for his motion. Assuming that his motion is for judgment as a matter of law under Rule 50(b), Breitman has failed to satisfy the heavy burden necessary to set aside a jury verdict.

A motion to set aside a jury verdict, formerly known as "judgment notwithstanding the verdict", or motion "j.n.o.v.", is covered by Rule 50 of the Federal Rules of Civil Procedure and is now known as a motion for "judgment as a matter of law".

Rule 50(a) provides, in pertinent part:

"(1) If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentia-

ry basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim, counterclaim, cross-claim, or third party claim that cannot under the controlling law be maintained without a favorable finding on that issue. "(2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment."

Rule 50(b), entitled "Renewal of Motion for Judgment After Trial" continues, in pertinent part:

"Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be renewed by service and filing not later than 10 days after entry of judgment. . . ."

A party who has failed to move pursuant to Rule 50(a) at the close of the presentation of evidence, formerly known as a motion for a "directed verdict", is precluded from moving under Rule 50(b) (for the former judgment n.o.v.) after the jury returns its verdict. (*Meriwether v. Coughlin*, 879 F.2d 1037, 1044 [2d Cir.1989]; *Oliveras v. American Export Isbrandtsen Lines, Inc.*, 431 F.2d 814, 816–17 [2d Cir.1970] [party's failure to move for directed verdict during trial bars consideration of motion for judgment n.o.v.]; *Posadas de Mexico, S.A. de C.V. v. Dukes*, 789 F.Supp. 121, 123–24 [S.D.N.Y.1992].)

The standard for granting a Rule 50(b) motion is the same as that for a Rule 50(a) motion, namely, such a motion should be granted when "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." (*Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1046 [2d Cir.1992]. *See also Jund v. Town of Hempstead*, 941 F.2d 1271, 1290 [2d Cir.1991] [citations omitted] [a rule 50(b) motion should be granted when "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him."] )

However, "courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." (*Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 134 [2d Cir.1986].)

▮ Based upon the law as stated above, the Court declines to set aside the jury's verdict. While, in the testimony involving Luckett, there was reference to another apartment in a building not owned by Breitman, substantial evidence was adduced that this incident concerned Matos's failure to offer Luckett the apartment in Breitman's building. To find that the jury even considered any other property in arriving at its determination with regard to this part of its verdict would be pure speculation. Even a cursory review of the trial transcript indicates a sufficient evidentiary basis for the jury's conclusion fixing liability on Breitman.

Further, the possible "nondiscriminatory reasons" for Matos's conduct offered by Breitman were properly for the jury's consideration and were apparently rejected. (*See United States v. Balistrieri*, 981 F.2d 916 [7th Cir.1992].) Had the jury accepted any of these reasons as the basis for the difference between the treatment of Luckett and that of the white tester, the jury would have answered "no" to question number five. Again, there is ample evidence to support the jury's determination in this regard.

Breitman places great weight on what he apparently perceives to be the singularity of the jury's failure to award even nominal damages against him, even after being instructed by the Court to reconsider its verdict. Cases in which a jury has found a constitutional violation yet declined to award nominal damages or awarded nominal damages only after

the court's direction are not unusual. (*See, e.g., Fassett v. Haeckel, supra,* 936 F.2d at p. 120 [jury declines to award nominal damages]; *Ruggiero v. Krzeminski, supra,* 928 F.2d at p. 561 [court directs nominal damages award].) A determination from the jury's failure to award nominal damages that it intended to exculpate Breitman is unwarranted. Rather, in the not uncommon circumstances presented here, the Second Circuit has instructed that the Court enter an award of nominal damages against the defendant.

Breitman's other arguments merit little discussion. His contention that the jury may have found that Matos was not acting within the scope of his agency for Breitman is disproven by the jury's "yes" answer to question number three. Breitman's argument that the verdict sheet is "ambiguous" is belied by his failure to clearly object to it in a specific manner, despite being given ample opportunity for review, as follows:

"THE COURT: Does anybody have any questions or anything else?"

MR. WAGMAN: I am troubled, frankly, your Honor, by the third item on the verdict sheet.

THE COURT: Yes.

MR. WAGMAN: Since your Honor in telling us this morning—

THE COURT: That's the agency?

MR. WAGMAN: Yes. Because your Honor told us this morning about the charges on agency that you were going to give, which involved control and scope of authority, and this third question, it seemed to me, requires some sub-questions, because even under the charge as your Honor described it, acting as agent for the rental of apartments doesn't carry with it acting as agent if the discrimination that is described in number five is found. It just doesn't follow.

THE COURT: I could not possibly begin to subdivide that question. It is a very complex and not a very clear concept. It is a very, very difficult concept. And you will notice that I specifically said, as the Court has explained that concept to you.

MR. WAGMAN: I noticed that and appreciate it.

THE COURT: That's the only way I can do it that is fair. Because when I go over the verdict sheet which the jury will have when I do that, I will tell them that I am now talking about the part of the charge where I discussed with you the concept of agency by and between the landlord as principals and the AM Realty Co. broker as agent. That's the best I can do. The first question is really separate and apart from two and three, because that's under the scope of the authority as an employee. So it is two and three that are separate. The only other agency theory we are talking about that they might be mixed up is the agency between the clients and the brokers. And I am not talking about that at all.

MR. WAGMAN: You are not, your Honor.

THE COURT: You see, sometimes brevity is better than getting everybody too confused and inconsistent.

I am telling you now that this jury will not leave with an inconsistent verdict, if we have to stay here all month, as I said.

The more questions on that subject in my view, the more possibility of problems. And I think it is as fair to you as it is to the plaintiffs.

In the exercise of my discretion I thought that is the best question. Not only that, but I spent an awfully lot of time, and this is about the sixth version that you saw for the first time of this verdict sheet.

MR. WAGMAN: I am sure, your Honor.

THE COURT: The one given to me by plaintiff's counsel with all due respect made my head whirl. I don't want to have my head whirl, nor the jury's head as well.

Brevity and simplicity, that's my experience with jury verdict sheets. I am very experienced in drawing jury verdict sheets, because this is the best I can do. Unless you come up with a better idea and I will be glad to listen to it.

MR. WAGMAN: Thank you, Judge."
(Tr. 1646–48.) [1]

Breitman's counsel was thus given an opportunity to "improve" the question on the verdict sheet, but declined to do so. Breitman's further arguments concerning the alleged ambiguity of the verdict sheet are merely a restatement of his original arguments, which the Court has previously rejected. The Court now adheres to that determination.

In light of the evidence presented, the law in the Second Circuit, and after considering the arguments of the parties, the Court denies Breitman's motion for "judgment on the verdict" and grants the Open Housing Center's motion for an award of nominal damages against Breitman. The Court directs that the Open Housing Center be awarded nominal damages in the sum of one dollar ($1.00) against the landlord-defendant Breitman.

## III. Jakabovitz's Motion to Set Aside the Verdict

■ Jakabovitz moves to "set aside the verdict as to Ramsey". Apparently, this motion is for judgment as a matter of law pursuant to Rule 50(b). Although a review of the trial transcript reveals a lengthy conversation between Jakabovitz's counsel and the Court at the close of the plaintiffs' case, with counsel for Jakabovitz making several motions, there is no indication of Jakabovitz having moved for judgment as a matter of law with respect to Ramsey's claims, as is required. (*See* Tr. 1235–47.) Accordingly, Jakabovitz's motion to "set aside the verdict as to Ramsey" is denied.

## IV. Equitable Relief

Prior to the Act's amendment, 42 U.S.C. § 3612(c) stated, in pertinent part:

"The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order...."

Post-amendment § 3613 contains the same language.

Similarly, the Civil Rights Acts of 1866 and 1870 have been construed to permit injunctive relief: "The fact that 42 U.S.C. § 1982 is couched in declaratory terms and provides no explicit method of enforcement does not ... prevent a federal court from fashioning an effective equitable remedy." (*Rogers v. 66–36 Yellowstone Blvd. Cooperative Owners, Inc.*, 599 F.Supp. 79, 81–82 [E.D.N.Y.1984].)

■ Extensive discrimination is not essential to the issuance of an injunction. (*Rogers v. 66–36 Yellowstone Blvd. Cooperative Owners, Inc., supra*, 599 F.Supp. at p. 82 [quoting the Fourth Circuit in *United States v. Hunter*, 459 F.2d 205, 218 n. 17 (4th Cir.), *cert. denied*, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972): "[A] pattern or practice ... is not an indispensable prerequisite.... Relief may be based on a single (unintentional) violation ... when ... a group of persons are denied their statutory rights and the case raises an issue of general public importance."] ) Since "an injunction will benefit others besides the suing plaintiff, the propriety of imposing that equitable remedy depends on each suit's facts—not on the number of violations or movants involved. The question, rather, is whether 'the facts ... were sufficiently flagrant to support that remedy.'" (*Rogers v. 66–36 Yellowstone Blvd. Cooperative Owners, Inc., supra*, 599 F.Supp. at p. 82 [quoting from *Sandford v. R.L. Coleman Realty Co.*, 573 F.2d 173, 178 (4th Cir.1978) ].)

A district court hearing a fair housing case is "fully empowered to eliminate the present effects of past discrimination", and may order the appropriate affirmative action to achieve this goal. (*United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 228 [5th Cir.1971]. *See* Armstrong, *supra* at p. 929.) The Court "has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." (*Williamsburg Fair Hous. Comm. v. New York City Hous. Auth.*, 493 F.Supp. 1225, 1250–51 [S.D.N.Y.1980] [citing *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965) and *Albemarle Paper Co. v. Moody*, 422 U.S.

1. Citations to "Tr." refer to pages of the trial transcript.

405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) ].) However, "[a] court should not grant injunctive relief unless there exists some cognisable danger of recurrent violation." (*Ragin v. Harry Macklowe Real Estate Co.*, *supra*, 801 F.Supp. at p. 1235 [citation omitted].)

■ Injunctive relief is appropriate in this case based upon the defendants' discriminatory treatment of the black and hispanic plaintiffs. (*See United States v. Youritan Constr. Co.*, *supra*, 370 F.Supp. at p. 651.) The Court has considered the evidence and arguments submitted by the parties and finds that equitable relief is warranted.

The jury's award of punitive damages against all of the defendants except Breitman is noteworthy. As the Court instructed the jury,

"In addition to actual damages, the law permits the jury under certain circumstances to award punitive damages to an injured plaintiff in order to punish a wrongdoer for *some extraordinary misconduct*, and to serve as an example or warning to others not to engage in such conduct. If you find from a preponderance of the evidence in the case that a plaintiff is entitled to a verdict for actual or nominal damages, and you further find that the act or omission of the defendant which proximately caused injury or damage to the plaintiff *was maliciously or wantonly or oppressively done*, then you may add to the award of actual or nominal damages such amount as you shall unanimously agree to be proper as punitive damages." (Tr. 1748 [emphasis supplied].)

That the jury awarded punitive damages against all of the defendants except Breitman demonstrates the jury's view that the conduct of defendants Jakabovitz, Fischler, Matos and Siegel constituted flagrant discrimination.

Equally significant is the jury's determination that Jakabovitz violated 42 U.S.C. §§ 1981 and 1982 with regard to his personal dealings with Ramsey. To find such a violation, the jury had to determine that Jakabovitz intentionally discriminated against Ramsey.

Considering the totality of the above circumstances, along with all of the evidence adduced at trial and the papers submitted by the parties post-trial, the Court finds that injunctive relief is proper as these defendants would likely engage in future discriminatory activity. (*See Rogers v. 66–36 Yellowstone Blvd. Coop. Owners, Inc.*, *supra*, 599 F.Supp. at p. 83 [injunction warranted even though only one discriminatory act proven].) The Court further finds that any harm the defendants would suffer as the result of an injunction is heavily outweighed "by the character and extent of the violations found here and the likelihood that violations will recur absent issuance of an injunction." (*Williamsburg Fair Housing Co. v. New York City Housing Auth.*, *supra*, 493 F.Supp. at p. 1251.) Accordingly, the Court grants the equitable relief set forth below.

The Court has conducted an extensive review of the cases in the Second Circuit and other circuits in which equitable relief was awarded to rectify incidents of housing discrimination. (*See, e.g., United States v. Starrett City Assocs.*, 660 F.Supp. 668 [E.D.N.Y. 1987], *aff'd*, 840 F.2d 1096 [2d Cir.], *cert. denied*, 488 U.S. 946, 109 S.Ct. 376, 102 L.Ed.2d 365 [1988]; *Rogers v. 66–36 Yellowstone Blvd. Coop. Owners, Inc.*, 599 F.Supp. 79 [E.D.N.Y.1984]; *Williamsburg Fair Housing Comm. v. New York City Housing Auth.*, 493 F.Supp. 1225 [S.D.N.Y.1980]. *See also United States v. West Peachtree Tenth Corp.*, 437 F.2d 221 [5th Cir.1971]; *United States v. Keck*, No. C89–1664C, 1990 WL 357064, 1990 U.S.Dist. LEXIS 19309 [W.D.Wash. November 15, 1990]; *United States v. Real Estate One, Inc.*, 433 F.Supp. 1140 [E.D.Mich.1977]; *Zuch v. Hussey*, 394 F.Supp. 1028 [E.D.Mich.1975]; *United States v. Youritan Constr. Co.*, 370 F.Supp. 643 [N.D.Ca.1973], *aff'd in part, remanded on other grounds*, 509 F.2d 623 [9th Cir.1975].)

While much of the relief awarded in these cases is worthwhile, such as requiring advertising in certain periodicals or holding seminars on fair housing, the Court finds that this kind of remedy, without more, would ultimately fail to ameliorate the defendants' previous discriminatory conduct or deter future

discrimination by these defendants and others.

Apparently, the only case in which a court awarded relief of the type the Court believes would be most effective is *Williamsburg Fair Housing Comm. v. New York City Housing Auth.*, 493 F.Supp. 1225 (S.D.N.Y.1980) (earlier proceeding at 450 F.Supp. 602 [S.D.N.Y. 1978].) In *Williamsburg*, the plaintiffs sued various defendants under, *inter alia*, the Fair Housing Act and 42 U.S.C. §§ 1981–83, for the employment of race-based quotas in the rental of vacant apartments in housing projects located in the Williamsburg section of Brooklyn. After exhaustive negotiations, most of the parties resolved their disputes and agreed to a consent decree, which required the housing projects to increase the number of non-white tenants and attain certain ratios of non-white tenants to white tenants. One group of defendants (the "Bedford defendants"), however, did not enter into the consent decree and opposed the district court's approval of it as it pertained to the other parties.

The plaintiffs moved for injunctive relief against the Bedford defendants. After a trial, Judge Tenney found that the Bedford defendants had indeed discriminated against non-whites in violation of the applicable statutes. Accordingly, he granted injunctive relief against the Bedford defendants, requiring them to abide by the terms of the consent decree. Consequently, the Bedford defendants were required to rent a certain number of their vacant apartments to non-white tenants in order to achieve the ratios of non-white tenants to white tenants set forth in the consent decree.

At this point, the Court notes that the culpability of the two landlord-defendants in this case is not equal. While the jury's verdict evidences the conclusion that Jakabovitz flagrantly discriminated against the plaintiffs, the same cannot be said for Breitman. As to Breitman, his liability is vicarious, attributable primarily to the discriminatory practices of AM Realty. Furthermore, in declining to award punitive damages against Breitman, the jury determined that he had not acted maliciously, wantonly or oppressively.

While the Court considers the relief the plaintiffs seek against the landlords much too severe and extreme, the Court is of the opinion that the only way to remedy the discrimination on the part of Jakabovitz and prevent future discriminatory activity is by ordering Jakabovitz to set aside a percentage of the vacancies which arise in his buildings and offer them first to qualified minority candidates, in addition to other remedies. Under the circumstances presented in this case, anything short of such relief would not adequately address the Fair Housing Act's goals of increasing housing integration and eliminating residential segregation.

Accordingly, the Court directs the following equitable relief:

*Declaratory Relief*

The Court declares that the actions of all of the defendants violated Title VIII of the Civil Rights Act of 1968, commonly known as the Fair Housing Act, codified at 42 U.S.C. § 3601 *et seq.*

The Court further declares that the acts of Jakabovitz with respect to the plaintiff Jeanette Ramsey violated the Civil Rights Acts 1870, 42 U.S.C. § 1981, and the Civil Rights Act of 1866, 42 U.S.C. § 1982.

The Court further declares that the broker-defendants Fischler and Matos continued to practice discrimination in violation of the consent decree of August 27, 1984.

*Injunctive Relief*

The broker-defendants Fischler, Matos and Siegel and the landlord-defendants Jakabovitz and Breitman are permanently enjoined from

(1) making unavailable or denying any apartment to any person on account of race, color, religion or national origin;

(2) discriminating against any person in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with such rental, because of race, color, religion or national origin;

(3) making, printing or publishing, or causing to be made, printed or published, any notice, statement or advertisement, with re-

spect to the rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion or national origin;

(4) representing to any person because of race, color, religion or national origin that any dwelling is not available for inspection or rental when such dwelling is in fact available; and

(5) engaging in any other discriminatory acts and practices that contribute to racial segregation.

*Affirmative Relief*

When Fischler, Matos and/or Siegel advertise(s), in any newspaper, magazine or other media, an apartment available in any building in which any defendant has an interest, he/they shall place a similar advertisement in *El Diario* and either the *City Sun* or *The New York Amsterdam News*.

Additionally, for each and every real estate agency in which Fischler has an interest or obtains such an interest in the future, or is a principal, officer or director, or becomes a principal, officer or director, he shall educate all of his sales personnel with respect to the kind of conduct that is required by and prohibited by this Order, and shall advise such salespersons that failure to comply with instructions given as to the conduct required by and prohibited by this Order may result in termination as a salesperson or other appropriate action, including sanctions under this Order. This instruction shall be given within thirty days after the date of this Order for each real estate agency in which Fischler has a current interest, stake or office, and within fifteen days of contracting with any new salesperson or acquiring any interest, stake or office in any real estate agency. Further, such instruction shall be repeated at least bi-annually with respect to all such persons.

Both Jakabovitz and Breitman shall each undertake the following:

(1) change their business's letterhead, stationery or other correspondence paper to include the statement "Equal Housing Opportunity" and the Equal Housing Opportunity logo;

(2) once per week for a twelve-week period commencing ten days after the date of this Order, place an advertisement no smaller than two column inches in the *New York Times, El Diario,* and either *New York Amsterdam News* or *City Sun,* stating the following:

**"Notice of Non–Discriminatory Policy in the Rental of Apartments**

[The defendant and his company or companies] welcome applications from qualified minority apartment seekers for the rental of available apartments in [his or their] apartment buildings. [The defendant and his company or companies] do not discriminate on the basis of race, color, religion or national origin in the rental of available apartments.";

(3) within thirty days from the date of this Order, in a letter signed by the defendant, notify each real estate broker which lists one or more vacancies in any of the defendant's buildings that the defendant and his company or companies is an equal housing opportunity lessor willing to consider all applications without regard to race, color, religion or national origin. A copy of this letter shall be sent to the plaintiff Open Housing Center, along with a list of all brokers and/or agencies to whom the letter is sent;

(4) for each advertisement of an apartment available for rental placed by the defendant in any newspaper, place a similar advertisement in *El Diario* and either the *New York Amsterdam News* or *City Sun.* The advertisement in *El Diario* and either the *New York Amsterdam News* or *City Sun* shall run for the same period of time as the advertisement in the other newspaper(s);

(5) each advertisement of an apartment(s) available for rental shall include a statement, prominently placed and easily legible, to the effect that all property listed in the advertisement is available for rental without regard to race, color, religion or national origin;

(6) prominently place a Fair Housing sign, of the type recommended by the Department of Housing and Urban Development (*see* 24 C.F.R. Parts 109, 110) and attached to the Affidavit of Phyllis Spiro as exhibit "F", in a

location clearly visible to all persons in, or immediately outside, each of the defendant's offices, and in the lobby of each of the defendant's buildings. When posted in the lobby of the defendant's building, the name, address and telephone number of the owner or management company of the building shall also be noted on the sign;

(7) within thirty days from the date of this Order, provide the Open Housing Center with the defendant's rental criteria, including the maximum number of persons who can occupy a one bedroom or studio apartment, the minimum length of time an applicant must have been employed proper to applying for an apartment, whether pets are allowed, and required financial status. The required financial status shall be the same for non-white tenants as for white tenants; and

(8) keep an "Applicant Flow Log" for each building, wherein shall be kept relevant information about each applicant, including an applicant's name, apartment sought, receipt date of application, applicant's race, color or national origin, and whether the applicant was accepted for rental or rejected. If a minority applicant is rejected for rental, the basis for such rejection shall be plainly stated in the "Applicant Flow Log" under the heading "reason for rejection". The recording of an applicant's race, color or national origin shall be solely for the purpose of complying with this Order and shall not be considered discriminatory.

In addition, Jakabovitz only shall undertake the following:

(1) for every fourth vacancy which arises in the "Jakabovitz unit", as defined below, Jakabovitz shall inform the Open Housing Center of such vacancy;

(2) for a seven-day period commencing with the day after notice is given, in accordance with the rental criteria provided to the Open Housing Center as required by this Order, the Open Housing Center shall refer qualified minority apartment seekers to Jakabovitz. During this seven-day period, Jakabovitz shall show the vacant apartment to and interview *only* the candidates referred by the Open Housing Center. Moreover, during this seven-day period, Jakabovitz

shall refrain from advertising the vacant apartment in any newspaper, magazine, or other media;

(3) if Jakabovitz rejects a prospective tenant referred by the Open Housing Center, he must inform the Open Housing Center and the applicant of the basis for this rejection. Such notification must be received by the Open Housing Center immediately upon the rejection;

(4) if, at the conclusion of this seven-day period, the vacant apartment has not been rented to an applicant referred by the Open Housing Center, Jakabovitz may proceed to rent the apartment in his usual fashion;

(5) the "Jakabovitz unit" is comprised of the following seven buildings:
1. 915 84th Street
2. 1579–1599 West 10th Street
3. 154–164 Avenue P
4. 1327–1337 46th Street
5. 2001–2013 Avenue P
6. 1530 East 19th Street
7. 301 Oriental Boulevard

*General Information*

(1) This Order shall be effective for two years from the date of this Order, except as otherwise noted.

(2) The terms of this Order shall be liberally construed to accord with the equal opportunity housing mandates of 42 U.S.C. §§ 1981 and 1982 and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

(3) The Court declines to award the Open Housing Center any sums for "monitoring" or other costs.

The Court has reviewed the opposition submitted by Jakabovitz to an award of equitable relief and finds his arguments to be without merit. Breitman primarily restates his arguments for "judgment on the verdict", which the Court previously addressed.

■ Jakabovitz argues that the Open Housing Center is not entitled to equitable relief because it lacked a private investigator's license in violation of New York State law. However, Jakabovitz cites no authority for his contention that the Open Housing

Center's actions constituted a "private investigation" as defined by New York law. Indeed, the Supreme Court has expressly approved the practice of "testing" employed by the Open Housing Center. (*See Havens Realty Corp. v. Coleman, supra,* 455 U.S. at p. 373, 102 S.Ct. at p. 1121.) Moreover, assuming that the Open Housing Center violated New York State law, Jakabovitz has supplied the Court with no case which holds that the appropriate remedy is the denial of equitable relief. Without any supportive authority, this argument is rejected.

■ In a similar vein, Jakabovitz argues that the Open Housing Center's certificate of incorporation does not provide for "investigations". Again, however, Jakabovitz fails to provide support for his contention that the appropriate remedy for such a violation is the denial of equitable relief. In any event, the Court finds that the Open Housing Center's "tests" do not violate this certificate. (*See* Reply Affidavit of Phyllis Spiro, Exh. "A" [the purposes of the Open Housing Center include "to promote the goals of fair housing laws, facilitate equal access to housing and assist members of the public who seek to enforce their rights...."].) It should also be noted that the Department of Housing and Urban Development, the primary source for funding for the Open Housing Center, expressly approves the administration of investigations of housing discrimination by organizations such as the Open Housing Center. (*See* Reply Affidavit of Phyllis Spiro, Exh. "B" [subsection entitled "Program Coverage"].)

Finally, Jakabovitz argues that to award the relief sought by the Open Housing Center would violate New York State Real Property Law Article 12–a concerning the licensing of real estate brokers. Specifically, Jakabovitz contends that the statute would be violated by an award of a sum for monitoring costs as sought by the Open Housing Center. Since the Court declines to award the Open Housing Center any such fee for monitoring costs or any other sum for the implementation of the above program, Jakabovitz's argument on this point is moot.

## V. Attorney's Fees and Costs

42 U.S.C. § 1988(b) provides:

"In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

Similarly, subsection § 3612(c), prior to amendment, further provides, in pertinent part:

"The court may grant as relief, as it deems appropriate ... court costs and reasonable attorney fees in the case of a prevailing plaintiff: *Provided,* That the said plaintiff in the opinion of the court is not financially able to assume said attorney's fees."

In its amendment of the Fair Housing Act, Congress abrogated the provision requiring the plaintiff to be in a state of financial need in order to recover attorney's fees. (42 U.S.C. § 3613[c][2] [1989].) While the amended section applies to fees incurred after the effective date of the amendment, the question arises as to whether the plaintiffs must show financial need in order to recover for fees incurred prior to the amendments' effective date. The Second Circuit has not addressed the issue of the retroactive application of any of the Fair Housing Act amendments.

"The Supreme Court's current position on retroactive application of civil statutes is, as the Court itself has acknowledged, somewhat unclear." (*Morgan Guar. Trust Co. v. Republic of Palau,* 971 F.2d 917, 921 [2d Cir. 1992].) In *Bradley v. School Bd.,* 416 U.S. 696, 710, 94 S.Ct. 2006, 2015, 40 L.Ed.2d 476 (1974), the Supreme Court held that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." Later, however, in *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988), the Court pronounced "Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be

construed to have retroactive effect unless their language requires this result."

While the Court in *Bowen* deviated from its holding in *Bradley*, it did not expressly overrule that case. One circuit court has stated that *Bradley* should be applied only to cases which present similar circumstances. (*Mozee v. American Commercial Marine Serv. Co.*, 963 F.2d 929, 938 [7th Cir.1992].)

Under this standard, the *Bradley* test is applicable here. *Bradley* concerned the retroactive application of section 718 of Title VII of the Emergency School Aid Act, which granted a federal court authority to award reasonable attorney's fees in a school desegregation case; before passage of that statute, there had been no provision for a fee award in such a case. The instant case, while similar, does not involve that degree of change, as it concerns a statutory amendment which simply modifies the criteria for receiving a fee award. The amendment at issue here does not create a new remedy.

Moreover, a review of recent Second Circuit decisions indicates that, despite *Bowen*, the *Bradley* standard is still entitled to consideration. (*See, e.g., Gonzalez v. Home Ins. Co.*, 909 F.2d 716, 723 [2d Cir.1990].)

In *Bradley*, the Supreme Court set forth the following formula for courts to use in determining the retroactive application of statutes: a court should consider "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." (*Bradley v. School Bd., supra*, 416 U.S. at p. 718, 94 S.Ct. at p. 2019.)

All three prongs of the *Bradley* test are satisfied by the circumstances presented in the instant case. With regard to "the nature and identity of the parties", "housing discrimination litigation is of a kind different from 'mere private cases between individuals' " in which "manifest injustice" could result. (*United States v. Rent Am., Corp.*, 734 F.Supp. 474, 479 [S.D.Fla.1990] [quoting from *Bradley v. School Bd. of the City of Richmond, supra*, 416 U.S. at p. 718, 94 S.Ct. at p. 2019].) In cases involving "great national concerns ... the court must decide according to existing laws." (*Bradley v.*

*School Bd. of the City of Richmond, supra*, 416 U.S. at p. 719, 94 S.Ct. at p. 2020 [quoting from *United States v. Schooner Peggy*, 5 U.S. 103, 1 Cranch 103, 2 L.Ed. 49 (1801) ].)

With regard to "the nature of [the parties'] rights", *Bradley* states that a court should not apply a statute retroactively when to so do would "infringe upon or deprive a person of a right that had matured or become unconditional." (*Bradley v. School Bd., supra*, 416 U.S. at p. 718, 94 S.Ct. at p. 2019.) In this case, the defendants would not be deprived of any such right if the attorney's fees provision is applied retroactively. The defendants' discriminatory practices "were unlawful before the effective date of the 1988 Act; they have no 'right' to avoid new penalties for the conduct which was unlawful at the time it occurred." (*United States v. Rent Am., Corp., supra*, 734 F.Supp. at p. 480.)

The third element of the *Bradley* test concerns "the possibility that new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard." (*Bradley v. School Bd., supra*, 416 U.S. at pp. 720–21, 94 S.Ct. at pp. 2020–21.) Applying the attorney's fees provision of the amended Act here neither changes the substantive obligations of the defendants nor increases their burden, as damages and attorney's fees could be imposed upon the defendants under the pre-amendment Act. (*See United States v. Rent Am., Corp., supra*, 734 F.Supp. at p. 480.) Retroactive application of the attorney's fees provision of the amended Act does not impose additional or unforeseeable obligations on the defendants. (*See id.*)

Moreover, "a request for attorney's fees should not result in a second litigation." (*Smiley v. Sincoff*, 958 F.2d 498, 501 [2d Cir.1992] [quoting from *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) ].) Failure to apply the amended attorney's fees provision retroactively would require the Court to hold a hearing into the plaintiffs' financial status. Such a proceeding would require the parties to incur additional expenses and may be an unnecessary expenditure of judicial resources for the following reasons: (1) a substantial part of the plaintiffs' attorney's fees would

not be affected by the hearing's outcome, as they were incurred after the effective date of the amendments; (2) as the Open Housing Center is a not-for-profit organization, there is a reasonable likelihood that it is financially unable to meet the legal costs it incurred in this case; and (3) the defendants have stated that in order to prepare for such a hearing, they will require further discovery.

The defendants argue that because Congress postponed the effective date of the amendments, it was Congress's intention that the amendments apply prospectively only. It has been stated that the "delayed effective date constitutes 'statutory direction' that the amendments are to be applied prospectively only". (*Ragin v. Harry Macklowe Real Estate Co., Inc., supra*, 801 F.Supp. at p. 1228 n. 8 [September 1988 amendments to the Fair Housing Act apply prospectively only].) While the effective date is evidence of Congress's intent, it is hardly conclusive. The Court found nothing in the legislative history which indicates that Congress intended the amended attorney's fees provision to apply prospectively only. (*Cf. Kaiser Aluminum Chem. Corp. v. Bonjorno*, 494 U.S. 827, 839, 110 S.Ct. 1570, 1578, 108 L.Ed.2d 842 [1990] [plain language of statute and legislative history, together with postponement of statute's effective date, indicated prospective application only].)

The purpose of the amendment to the Fair Housing Act's fee provision was to "bring[ ] attorney's fee language in title VIII closer to the model used in other civil rights laws." (H.Rep. No. 711, 100th Cong., 2d Sess. 13, *reprinted in* 1988 U.S.C.C.A.N. 2173, 2174.) The Court finds that this goal is best served by applying the amended attorney's fees provision of the Fair Housing Act to the circumstances presented in this case.

Moreover, it should be noted that in the case cited by the defendants for the proposition that the delayed effective date indicates prospective application only, *Ragin v. Harry Macklowe Real Estate Co., Inc.*, 801 F.Supp. 1213, 1228 n. 8 (S.D.N.Y.1992), the Court was considering the application of a limitations period. Similarly, in *Seniors Civil Liberties Ass'n, Inc. v. Kemp*, 761 F.Supp. 1528, 1543–44 (M.D.Fla.1991), *aff'd*, 965 F.2d 1030 (11th Cir.1992), another case cited by the defendants, the question before the court concerned the effect of the amendments on substantive rights, specifically, what type of housing was covered by the Act. In the instant case, however, the defendants' substantive rights are not implicated by retroactive application of the amended attorney's fees provision. Instead, the only consideration is one of the penalties for the defendants' prior discriminatory activities.

Accordingly, the Court will apply the attorney's fees provision of the Fair Housing Act, as amended, to the plaintiffs' entire fee application. This section of the amended Act provides "In any civil action under subsection (a) of this section, the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee and costs...." (42 U.S.C. § 3613[c][2] [Supp.1992].) The plaintiffs are not required to show financial inability to pay their attorney's fees in order to receive a fee award.

In order to obtain an award of attorney's fees under either the Fair Housing Act or § 1988, one must be a "prevailing party." The Supreme Court has defined a "prevailing party" as one who succeeds on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." (*Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 [1989]. *See also Hensley v. Eckerhart, supra*, 461 U.S. at p. 433, 103 S.Ct. at p. 1939.) A plaintiff who wins nominal damages is such a "prevailing party". (*Farrar v. Hobby*, —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 [1992].)

The amount of an award of attorney's fees in a civil rights case is determined by using the "lodestar" method. (*Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 [1989]; *Hensley v. Eckerhart, supra*, 461 U.S. at p. 433, 103 S.Ct. at p. 1939.) The amount of the fee award is initially estimated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. (*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563, 106 S.Ct. 3088,

3097, 92 L.Ed.2d 439 [1986].) A reasonable attorneys fee

"is one calculated on the basis of rates and practices prevailing in the market, *i.e.*, 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation,' [citation omitted], and one that grants the successful civil rights plaintiff a 'fully compensatory fee,' [citation omitted], comparable to what 'is traditional with attorneys compensated by a fee-paying client.'" (*Missouri v. Jenkins,* 491 U.S. 274, 286, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 [1989] [citation omitted]. *See also Blum v. Stenson,* 465 U.S. 886, 895–96 & n. 11, 104 S.Ct. 1541, 1547–48 & n. 11, 79 L.Ed.2d 891. [1984].)

The amount of an award, however, must ultimately be determined on the facts of the case. (*Hensley v. Eckerhart, supra,* 461 U.S. at p. 429, 103 S.Ct. at p. 1937.)

The Second Circuit has noted that of particular applicability in determining the amount of an award of attorney's fees in a civil rights case are the twelve factors set forth by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 719 (5th Cir.1974). (*United States Football League v. National Football League,* 887 F.2d 408, 415 [2d Cir.1989] [citing *Johnson* ], *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 [1990].) These factors are: (1) the time and labor required; (2) the novelty of the legal questions; (3) the skill level required; (4) whether accepting the case precluded the attorney from accepting other work; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or situation; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the relationship with the client; and (12) awards made in similar cases. (*See, e.g., Blanchard v. Bergeron, supra,* 489 U.S. at p. 91 n. 5, 109 S.Ct. at p. 943 n. 5 [citing *Johnson v. Georgia Highway Express, Inc., supra* ].) The Court notes, however, "that many of these factors usually are subsumed within the initial calculation of hours reason-

ably expended at a reasonable hourly rate." (*United States Football League v. National Football League, supra.*)

Pursuant to 42 U.S.C. § 3613(c)(2), the plaintiffs can recover reasonable attorney's fees and costs from each defendant. Additionally, the plaintiffs can recover attorney's fees and costs from Jakabovitz pursuant to 42 U.S.C. § 1988.

The plaintiffs seek an award of attorney's fees in the sum of $883,386.50, plus $92,-251.99 for costs and disbursements, for a total sum of $975,638.49. This application seeks compensation for approximately 4,800 attorney-hours and 1,500 paralegal-hours. The Court has considered the arguments of all parties and the records submitted by the plaintiffs, and awards attorney's fees in the sum of $335,280.20, including costs and disbursements, against all defendants as set forth below.

██ Jakabovitz contends that the rates at which the plaintiffs' counsel seeks to recover are too high and must be reduced. For example, David N. Brodsky, the plaintiffs' "lead attorney", charges rates ranging from $300 to $425 per hour, while associates charge rates as high as $270 per hour.

Prevailing parties "are entitled to reasonable hourly rates which fall within the prevailing marketplace rates in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." (*New York State Nat'l Org. for Women v. Terry,* 737 F.Supp. 1350, 1361 [S.D.N.Y. 1990] [citation omitted], *aff'd in part, rev'd in part on other grounds,* 961 F.2d 390 [2d Cir.1992].) The Court has reviewed the applicable law in this Circuit and determines that, based upon the type of work performed and the experience of the attorneys, the following maximum rates are reasonable: for partners, no more than $200 per hour; for associates, no more than $135 per hour. (*See, e.g., Huntington Branch NAACP v. Town of Huntington,* 749 F.Supp. 62, 65 [E.D.N.Y.1990] [rates of $135–$225 per hour appropriate in housing discrimination case, where counsel performed "extremely ably" and have experience in civil rights cases]; *Clarke v. Frank,* No. 88 CV 1900, 1991 WL 150774, 1991 U.S. Dist. LEXIS 10601

[E.D.N.Y. July 26, 1991] [$200 per hour rate reasonable in civil rights case]. *See also Jennette v. New York*, 800 F.Supp. 1165, 1169 [S.D.N.Y.1992] [sole practitioner with ten years' experience in civil rights actions awarded $200 per hour]; *Nu–Life Constr. Corp. v. Board of Educ.*, 795 F.Supp. 602, 606 [E.D.N.Y.1992] [counsel awarded fees at rates of $165–$200 per hour in RICO action]; *Malarkey v. Texaco, Inc.*, 794 F.Supp. 1237, 1246 [counsel inexperienced in civil rights cases awarded $175 per hour for partners, $100 per hour for associates], *aff'd*, 983 F.2d 1204 [2d Cir.1993]; *Ortiz v. Regan*, 777 F.Supp. 1185, 1188–89 [S.D.N.Y.1991] [counsel seeking $300–$400 per hour in pension case awarded $250 per hour], *aff'd in part, rev'd in part on other grounds*, 980 F.2d 138 [2d Cir.1992]; *New York State Nat'l Org. for Women v. Terry, supra*, 737 F.Supp. at p. 1361 [rates of $160–$210 per hour reasonable in civil rights case, based upon rates charged by major New York City firms with litigation practices].) Accordingly, all partners whose listed billing rates exceed $200 per hour will be compensated at $200 per hour; similarly, all associates whose listed billing rates exceed $135 per hour will be compensated at $135 per hour.

■ Additionally, paralegals' time is includable in an award of attorney's fees. (*United States Football League v. National Football League, supra*, 887 F.2d at p. 416. *See Missouri v. Jenkins, supra*, 491 U.S. at pp. 285–86, 109 S.Ct. at pp. 2468–69 ["the 'reasonable attorney's fee' provided for by statute should compensate the work of paralegals, as well as that of attorneys."]) The Court compensates plaintiffs' counsel for the work performed by paralegals at a rate of $50 per hour. (*See Aetna Casualty and Surety Co. v. Namrod Devel. Corp.*, No. 91-1609, 1992 WL 367100, 1992 U.S. Dist. LEXIS 17843 [S.D.N.Y. Nov. 24, 1992] [work performed by paralegals compensated at rate of $55 per hour]; *Lewis v. Tuscan Dairy Farms, Inc.*, No. 87-7607, 1992 WL 226927, 1992 U.S. Dist. LEXIS 13244 [S.D.N.Y. Sept. 3, 1992] [approximate rate for work performed by paralegals is $50 per hour]; *Kahn v. General Motors, Corp.*, No. 88-2982, 1992 WL 208286, 1992 U.S. Dist. LEXIS 12191 [S.D.N.Y. Aug. 14, 1992] [work performed by paralegals compensated at rate of $55 per hour].)

■ Similarly, the Court finds that the amount of hours for which plaintiffs' counsel seeks compensation, specifically, 4,800 hours spent by attorneys and 1,500 hours spent by paralegals on this case, is unreasonable. In *Huntington Branch NAACP v. Town of Huntington*, 749 F.Supp. 62 (E.D.N.Y.1990), a case similar to the instant matter, counsel sought to recover for 2359.75 hours of work performed over a period of nine years, including a trial, various motions, both pre- and post-trial, and the entry of judgment. (*See also* other proceedings at 961 F.2d 1048 [2d Cir.1992]; 844 F.2d 926 [2d Cir.1988]; 689 F.2d 391 [2d Cir.1982]; 762 F.Supp. 528 [E.D.N.Y.1991]; 749 F.Supp. 62 [E.D.N.Y. 1990]; 668 F.Supp. 762 [E.D.N.Y.1987]; 530 F.Supp. 838 [E.D.N.Y.1981].) Giving plaintiffs' counsel every benefit of the doubt, the Court cannot view the expenditure of 4,800 attorney-hours and another 1,500 paralegal-hours as necessary or reasonable. Upon an examination of plaintiffs' counsel's papers and the attached records, the Court finds that a twenty-five percent reduction of counsel's hours to be reasonable: to 3,600 for attorneys, spread evenly among partners and associates, and 1,125 for paralegals. Based upon these hours and the above rates, the lodestar figure computes to $507,195.00.

■ Central to an application for attorney's fees is the submission of time records reflecting the hours expended by counsel in pursuing the successful claims of their client. In order for a party to recover attorney's fees, such time records must be made contemporaneously with the associated work. (*See Lewis v. Coughlin*, 801 F.2d 570, 577 [2d Cir.1986].) Furthermore, "[t]hese records should specify, for each attorney, the date, the hours expended, and the nature of the work done." (*New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 [2d Cir.1983].) "The burden is on counsel to keep and present records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required; where adequate contemporaneous records have not

been kept, the court should not award the full amount requested." (*F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1265 [2d Cir.1987] [applying New York State law and noting that the Second Circuit rule is similar to that of New York]; *see also Soler v. G & U Inc.*, 801 F.Supp. 1056 [S.D.N.Y. 1992].)

Plaintiffs' counsel submitted a computer printout which comprises its documentation in support of the plaintiffs' fee application. Jakabovitz contends that the descriptions contained in the printout are too vague and insufficient to support a fee application.

The following is a list of some of the descriptions contained in the printout: "staff meeting"; "talk w/SAP, Bove, P. Spiro"; "processed documents"; "tc w/Sheinfeld, Lorin, Wolf; meet w/JJ re docs"; "confs w/MRH; meeting w/Luckett". Similarly vague and cryptic descriptions can be found throughout counsel's computer records.

While vague descriptions such as those listed above are not fatal to a fee application, courts in this Circuit have reduced fee awards due to the lack of specificity in time records. (*See United States Football League v. National Football League*, *supra*, 887 F.2d at p. 415; *New York State Ass'n for Retarded Children, Inc. v. Carey*, *supra*, 711 F.2d at p. 1146; *Soler v. G & U, Inc.*, *supra*, 801 F.Supp. at pp. 1060–61; *Nu–Life Constr. Corp. v. Board of Educ.*, *supra*, 795 F.Supp. at p. 607; *Meriwether v. Coughlin*, 727 F.Supp. 823, 827 [S.D.N.Y.1989].)

In light of the numerous entries which contain insufficient descriptions of the work done and the need for it, the Court reduces the lodestar amount by thirty percent. (*See Nu–Life Constr. Corp. v. Board of Educ.*, *supra*, 795 F.Supp. at p. 607 [thirty percent reduction for vague entries]. *See also United States Football League v. National Football League*, *supra*, 887 F.2d at p. 415 [thirty percent reduction due to, *inter alia*, vague entries]; *New York State Ass'n for Retarded Children, Inc. v. Carey*, *supra*, 711 F.2d at p. 1146 [5%–20% reductions made to multiple claims for fees upon objections to duplicative and excessive hours]; *Meriwether v. Coughlin*, *supra*, 727 F.Supp. at pp. 831 [15% re-

duction for entries too vague to assess reasonableness].)

■ Furthermore, as Jakabovitz argues, the plaintiffs cannot recover attorney's fees for McCoggle's unsuccessful claims. "[W]ork that is based on different facts and legal theories than a successful one may not be included in the fee award." (*United States Football League v. National Football League*, *supra*, 887 F.2d at p. 413 [citing *Hensley v. Eckerhart*, *supra*, 461 U.S. at p. 434–35, 103 S.Ct. at p. 1939–40.) However, a plaintiff's various claims may be based upon a common set of facts or similar legal theories. In such an instance, it would be impractical to divide the hours on a claim-by-claim basis, as a large portion of the attorney's time will likely have been spent on the case as a whole, rather than on individual claims. Under these circumstances, a district court

> "should focus on the significance of the overall relief obtained by the plaintiff. [citation omitted] Where a plaintiff has achieved only partial or limited success, full compensation of attorney's fees would not be reasonable. [citation omitted] The district court may either attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." (*United States Football League v. National Football League*, *supra*, 887 F.2d at p. 414 [citation omitted].)

■ While the plaintiffs did not succeed on McCoggle's claims, they did obtain significant relief. A further substantial reduction on this basis is unwarranted. Because it would be impractical to scrutinize the computer printout for hours spent on McCoggle's claims, due to the fact that much of plaintiffs' counsel's work was spent on all of the plaintiffs' claims rather than one or two claims in particular, the Court further reduces the lodestar amount by ten percent.

For the above reasons, the Court reduces the lodestar by a total of forty percent. Consequently, the Court awards the plaintiffs the sum of $304,317.00 for attorney's fees.

The Court has reviewed the defendants' other objections to the plaintiffs' application

for counsel fees and finds them to be without merit. Many of their arguments are the same as those in opposition to the motion for equitable relief, and have already been rejected by the Court. The Court similarly rejects Jakabovitz's argument that an award of attorney's fees should be in proportion to the amount of damages awarded, for which he cites a 1981 case from the Northern District of Illinois. The Second Circuit "has consistently rejected the notion that an award of attorney's fees be proportional to the amount of damages recovered." (*Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 160 [2d Cir.1992].)

With regard to the plaintiffs' application for costs and disbursements, a court will generally award "those reasonable out-of-pocket expenses incurred by the attorney and which are normally charged fee paying clients." (*Reichman v, Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 283 [2d Cir.1987].) "A prevailing party may be reimbursed for expenditures which add to the proceeding and are not part of the attorney's ordinary overhead." (*New York State Nat'l Org. for Women v. Terry, supra*, 737 F.Supp. at p. 1363.)

The Court has reviewed the affidavits and accompanying cost records submitted by David M. Brodsky, Esq. and Lynn E. Judell, Esq., plaintiffs' counsel, in which they seek $92,251.99, including $3,900.00 in expert witness fees. The defendants have not challenged the reasonableness of the amount of costs requested.

Under applicable law, the plaintiffs can recover only $40 for expert witness fees. (*West Virginia Univ. Hospitals v. Casey*, 499 U.S. 83, ——, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 [1991].) While the Supreme Court's determination that expert witness fees are not subject to shifting was overruled by the 1991 Civil Rights Act, that Act does not govern this case. The plaintiffs cite this Court's decision in *Croce v. V.I.P. Real Estate, Inc.*, 786 F.Supp. 1141 (E.D.N.Y.1992), for the proposition that the expert witness fees provision of the Civil Rights Act of 1991 should be applied retroactively. Even if *Croce* eventually should be affirmed by the Second Circuit, in that case the Court simply held that the plaintiff could amend her complaint to include a jury demand and a claim for compensatory damages under the 1991 Act. The plaintiffs in this case never sought to amend their complaint to seek expert witness fees, or bring any claim, under the 1991 Act. Furthermore, the procedural settings of the two cases are entirely different. In *Croce* the plaintiff moved at the outset of the litigation, while this case is in its final stages. Consequently, the Court awards the plaintiffs the sum of $40 for expert witness fees.

Moreover, the plaintiffs' list of expenses, like their time records, is rife with vague and cryptic entries. Descriptions of disbursements include simply "car rental and taxi", "air freight Federal Express Corp.", and many entries entitled "miscellaneous". It is wholly unclear which of these expenses, if any, were necessary or related to compensatory activity.

However, the Court credits the manner in which plaintiffs' counsel conducted this case and the good faith which they have shown with respect to these post-trial motions. Consequently, rather than disallow the entire application for costs and disbursements, the Court awards the plaintiffs expenses in proportion to the award of attorney's fees. (*See In re Agent Orange Prod. Liab. Litig.*, 611 F.Supp. 1296, 1381 [E.D.N.Y.1985], *aff'd in part and rev'd in part on other grounds*, 818 F.2d 226 [2d Cir.1987].)

The Court above awarded the plaintiffs thirty-five percent of the amount they sought for attorney's fees. Accordingly, the Court awards them thirty-five percent of $88,351.99 ($92,251.99 less the $3,900 for expert witness fees), or $30,923.20, plus the sum of $40 for expert witness fees, for a total award of costs and disbursements in the sum of $30,963.20. The total award of attorney's fees, costs and disbursements to the plaintiffs is the sum of $335,280.20.

As to the plaintiffs' contention that the defendants should be held jointly and severally liable for attorneys fees and costs, the allocation of fee liability is a matter committed to this Court's discretion. (*Koster v. Perales*, 903 F.2d 131, 139 [2d Cir.1990].)

<hr />

Based upon the Court's review of the special verdict sheet, the papers submitted by the parties, the trial transcript, and all of the evidence admitted at the trial, the Court concludes that the allocation to each defendant of a specific percentage of the fee award is equitable and, in fact, required, based primarily upon the parties' greatly varying degrees of culpability (*see Koster v. Perales, supra*, 903 F.2d at p. 139; *Jose P. v. Ambach*, 669 F.2d 865, 871 [2d Cir.1982] ), and, secondarily, upon the proportion of time spent litigating against each defendant (*see Koster v. Perales, supra*, 903 F.2d at p. 139 and cases cited therein). Accordingly, the defendants' liability for the award of fees and costs is as follows: Jakabovitz, 60% ($201,-168.12); Breitman, 20% ($67,056.04); Fischler, 12½% ($41,910.03); Matos, 5% ($16,-764.01); and Siegel, 2½% ($8,382.00).

## CONCLUSION

For the foregoing reasons, the Court (1) grants the plaintiff Open Housing Center's motion for an award of nominal damages against landlord-defendant Breitman; (2) denies landlord-defendant Breitman's motion for "judgment on the verdict"; (3) denies landlord-defendant Jakabovitz's motion to set aside the verdict as to plaintiff Ramsey; (4) grants the plaintiffs' motion for equitable relief against all defendants as described above; and (5) grants the plaintiffs' application for attorney's fees and costs against all defendants in the total sum of $335,280.20 in the percentages set forth above.

The Clerk of the Court is directed to enter judgment in favor of the plaintiffs in accordance with the instructions set forth in this Order.

SO ORDERED.